UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SONYA STIRGUS                    *CIVIL ACTION
                                 *NO. 17-11645
VERSUS                           *
                                 *SECTION "B" 1
DILLARD DEPARTMENT STORES,       *
INC.                             *
*   *   *   *   *   *   *   *   *  **

Deposition of **WALTER BOONE**, 333 Belleville Street, New Orleans, Louisiana 70114, taken in the offices of Galloway, Johnson, Tompkins, Burr and Smith, One Shell Square, 40th Floor, New Orleans, Louisiana 70139, on Wednesday, the 20th day of June, 2018.

COPY

Exhibit "A"

ASSOCIATED REPORTERS, INC./504.529.3355

APPEARANCES:

FOR THE PLAINTIFF:
LAW OFFICE OF WARREN A. FORSTALL
WILLIAM E. MURA, JR., ESQUIRE
320 NORTH CARROLLTON AVENUE
SUITE 200
NEW ORLEANS, LOUISIANA  70119

FOR THE DEFENDANT:
GALLOWAY, JOHNSON, TOMPKINS, BURR &
  SMITH
JASON A. CAMELFORD, ESQUIRE
ONE SHELL SQUARE - 40TH FLOOR
NEW ORLEANS, LOUISIANA  70139

REPORTED BY:

ROBERT K. TUCKER
CERTIFIED COURT REPORTER
STATE OF LOUISIANA

*      *      *      *      *

ASSOCIATED REPORTERS, INC./504.529.3355

INDEX

EXAMINATION BY:

MR. MURA                                    5

MR. CAMELFORD                              46

EXHIBITS:

(NONE INTRODUCED.)

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading, signing, sealing, certification, and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

ROBERT K. TUCKER, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath to the witness.

ASSOCIATED REPORTERS, INC./504.529.3355

**WALTER BOONE**, who, after having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. MURA:

Q.    Give us your name for the record, please.

A.    Walter Boone.

Q.    And how old are you, Mr. Boone?

A.    Thirty-three.

Q.    And your present address is?

A.    333 Belleville Street, New Orleans, Louisiana, 70114.

Q.    Okay.  And my name is Bill Mura, M-U-R-A.  I'm an attorney and I represent the lady, Ms. Stirgus, who claims she had an incident at the Dillard's at Oakwood back on October 21st of 2016.  That's who I am, okay?

A.    Okay.

Q.    And I'm just going to ask you some questions.

And, if you know the answers, tell me the answers, and if you don't know, tell me you don't know.

A.    Okay.

Q.    All right.  You are still employed with Dillard's?

A.    Yes.

Q.    And what is your capacity and where do you work?

A.    I'm an area sales manager.

Q.    Area sales manager.  Go ahead. What store?

A.    I work at Oakwood.

Q.    Still at Oakwood?

A.    Still at Oakwood Mall.

Q.    That's where you were at the time of this incident back in October?

A.    Yes.  Yes.

Q.    And what was your position back in October 2016?

A.    Same:  Area sales manager.

Q.    I think -- that is ASM, right?

A.    Uh-huh (Affirmative Response), yes, area sales manager.

Q.    And tell me.  What does it mean to be an area sales manager for Dillard's at Oakwood?

A.    That's a pretty expansive question.  Our main job is to drive sales.

Q.      Drive sales?

A.      Right, make sure we look after the inventory and the personnel, doing scheduling, budgeting.

Q.      Scheduling of personnel?

A.      Of personnel and budgeting for inventory and personnel hours, opening the store, closing the store, and then, of course, helping customers as needed.

Q.      Okay.  Would that also include the area, the setting up and taking down of displays and mannequins and stuff like that?

A.      In some cases.

Q.      In some cases.  Okay.

        How many -- back in October 2016, how many area sales managers did they have at that Dillard's?

A.      Five or six.

Q.      Five or six?  And when you say area sales, I take that to mean certain departments and certain areas of the store, not the entire store, is that right?

A.      Correct.

Q.      So what areas were you the sales

ASSOCIATED REPORTERS, INC./504.529.3355

manager of?

A.    Shoes.

Q.    Shoes?

A.    Ladies' shoes, men's shoes, kids' shoes.

Q.    What about lingerie?

A.    No.

Q.    How'd you become involved in the lingerie department to do this accident report?

A.    I was one of two area managers on duty, so when we're there, we have to handle customer issues.

Q.    Does the lingerie department have an area sales manager?

A.    They do not.

Q.    So under which area sales manager would they fall, if any?

A.    They would fall under a business manager.

Q.    A business manager?

A.    Which is just below an area sales manager.

Q.    Okay.  So who would be or have been the business manager back in October

Case 2:17-cv-11645-ILRL-JVM    Document 13-4    Filed 08/07/18    Page 9 of 54

9

of 2016?

A.    I don't know.

Q.    Okay.  So you have manager, area sales managers, and then business managers?

A.    Yes.

Q.    Is that like the hierarchy of the store?

A.    Yes.

Q.    Okay.  Would the area sales manager -- I'm sorry.  Would the business manager be under the direction of an area sales manager?  And I'm talking about the lingerie department.

A.    Not in the case of lingerie.

Q.    So a business manager for lingerie would be reporting directly to the store manager?

A.    That's correct.  There's an assistant store manager and a store manager.

Q.    Okay.

A.    And they would report.

Q.    Manager, assistant manager go to area sales managers and some business managers, either below the area sales

managers or on the side?

A.    Correct.

Q.    Got it.  Okay.

Well, tell me how you came --
I'm sorry.  When did you start with
Dillard's?

A.    I started with Dillard's in May
of 2014 in Hattiesburg, Mississippi.

Q.    Okay.  And then you eventually
worked your way to New Orleans?

A.    Yes.

Q.    Are you from Mississippi or from
New Orleans?

A.    From Mississippi.

Q.    Okay.  And was that considered a
promotion; to come down here?

A.    It was.  It's higher volume, so
uh-huh (Affirmative Response).

Q.    All right.  Well, tell me how
you came to know about the incident that
we're here about today, this incident with
the mannequin.

A.    The associate that was in that
department let our customer operator know
that a customer needed assistance with an

incident that had happened and I was one of two managers on duty, so I got the page.

Q.   Okay.  And that was Ms. Kiara Landry?

A.   Ms. Landry, yes.

Q.   Ms. Landry is good enough.

Okay.  And she was a -- what was she at the time?

A.   She was an associate.

Q.   What does that mean, to be an associate?

A.   A sales associate, so she was --

Q.   In the lingerie department?

A.   That's correct.

Q.   Okay.  So you got a page.  Tell me what happened.

A.   So when I got the page, it was an accident, so I --

Q.   Is that a secret code that you use?

A.   No, not at all.  The assistant let me know I do need to get my paperwork together to go assist the customer.

Q.   When they page you, it's over the speaker system in the store?

A.    Well, that's correct.

Q.    So that's what I'm saying.  Do they use like area sales manager report to whatever, code 3?

A.    Sort of.

Q.    Sort of?  You don't have to tell me any store secrets.

MR. CAMELFORD:

Make sure he finishes asking the question.

EXAMINATION BY MR. MURA:

Q.    How did you know to go there because of an accident?

A.    Once I answered my page, the operator let me know.

Q.    So how do you answer a page?

A.    So they announce over the intercom for me to dial a certain number.

Q.    Oh, okay.

A.    And I dial that number.

Q.    Talk to the operator?

A.    Talk to the operator.

Q.    You did not talk to Ms. Landry?

A.    Not until I got to the --

Q.    Okay.  So you got your page.

You talked to the operator.  She told you to go to the lingerie department?

A.    That's correct.

Q.    And some kind of incident involving a customer?

A.    That's correct.

Q.    Okay.  Take it from there.

A.    So when I arrived at the area, of course, the event had already happened and I'm just there to gather information, make sure the customer's okay.

I walk up, and it's a lady and her two kids and they're still in the general area where the accident happened. The kids were kind of running around.  The little boy was really interested in my clipboard.  But I noticed that -- I'm sorry.  What's the -- what's her name?  Do I need to address her as her name?

Q.    The lady?

A.    Yes, sir.

Q.    Ms. Stirgus?

A.    Ms. Stirgus.  I noticed Ms. Stirgus.  She looked like she was -- she had been crying at some point, so her well-

being was, of course, my immediate concern. So I wanted to ask her if she was okay, did she need medical attention. She said she was okay, she didn't need to go to the doctor, she just wanted to let somebody know what had happened.

I again asked her if she was sure she didn't need medical attention, took her information, made sure she had our information in case she did need to seek medical attention. But she told me she was just going to continue shopping; that she felt well enough to do so and she had some more things to get at the store.

After that, I took the pictures that were required of me to take of the area, and then I filed it.

Q.    This report?

A.    That's correct.

Q.    It's called a Customer Accident Investigation Report?

A.    That's correct.

Q.    And did you take the three pictures that I've been given?

A.    I did.

ASSOCIATED REPORTERS, INC./504.529.3355

Q.    Is that part of the accident investigation protocol?

A.    Yes, sir.

Q.    Three in particular or --

A.    There's no number.

Q.    No number on it?

A.    No.

Q.    All right.  Okay.  Is this the -- is this one page the extent of the report that you wrote?

A.    It is.

Q.    There's no other piece of paperwork other than that and the accident witness statement filled out by Ms. Landry?

A.    Yes, sir.  That's all there is.

Q.    That's all there is.

And when you complete the report, what do you do with that?

A.    We file it.  I don't handle anything after that as far as what's done with it.

Q.    What do you mean by when you file it?

A.    The store secretary creates a file with the information in case we need

to pull it at a later date.

Q.    Is it reported to any kind of insurance company or insurance servicing company, anything like that?

A.    I don't know.

Q.    Don't know?  Okay.

Okay.  And so did you look to determine -- let's go back.

Can you tell me the rest of the Dillard's accident investigation protocol, particularly, when it involves a customer that would have been in effect October of 2016?

A.    I'm sorry?

Q.    The accident investigation protocol for Dillard's, when it involves a customer in the store, you said you take the pictures, you fill out the form.  Is there anything else that you do?

A.    Well, the first thing we do is make sure the customer is okay.

Q.    Okay.

A.    And if they need medical attention.

Q.    Check on the customer.  Okay.

A.    Is everyone safe, is the area safe.

Q.    Okay.

A.    And then, if everything is safe, the customer's okay, we take the information that we need.

Q.    Make sure the area is safe or saved?

A.    Safe, S-A-F-E.

Q.    So what do you do after that? Then you fill out the form?

A.    Yes.

Q.    By talking to the customer?

A.    Yes.

Q.    And then you also talk to the witnesses?

A.    Correct.

Q.    Or do you just have them write a statement?

A.    That's basically what we do; have them write their statement.

Q.    Did you also talk to Ms. Landry?

A.    I asked her if she had seen anything and let her know that she would have to fill out a statement since she was

the only one in the area.

Q.    Okay.  Is that -- what's the rest of the protocol?  That's it?

A.    That's basically it, if you put all that together.

Q.    Okay.  And then you complete the forms and it goes into the file?

A.    To my knowledge.

Q.    And then after that you don't know what happens?

A.    That's correct.

Q.    Okay.  Do you -- is there anything in the accident investigation protocol up to the time of completing the reports and filing them that is concerned with the cause of the accident?  I see several things on here about type of accident, parts of body hurt, types of injury, damage, stuff like that.  Do you do anything about that?

A.    Could you be more specific?

Q.    Well, like investigate the cause of an accident.  Like in this accident, can you tell me what caused this accident?

A.    To the best that we can, but, in

this case, we couldn't determine what caused the accident.  The customer said it just fell.

Q.    It?

A.    The mannequin.

Q.    The mannequin?

A.    The mannequin just fell.

Q.    Okay.  And did you determine that the mannequin had fallen?

A.    When I arrived, it was not in the place it was, so I had to assume that it fell.

Q.    What was the place it was?

A.    It was on the shelf.  It was on its display shelf as in that picture.

Q.    Did you know that or were you told that?

A.    It's been there for a long time.

Q.    Okay.  And this is the picture you took of the -- what'd you call it, a shelf or display?

A.    It's a display.  But the mannequin was on that shelf-like section.

Q.    Okay.  And this is the mannequin that we're talking about?

20

A.      Yes.

Q.      Okay.   What did you call her?
Did the sales associate move the mannequin
before you got there, to the scene?

A.      Not to my knowledge.

Q.      So where was the mannequin when
you got there?

A.      It was --

Q.      Was it in that position depicted
in the photograph?

A.      I don't remember.

Q.      Okay.   I mean, I see that little
thing kids do with the bottles on the
commercial, where it stands up, you know?
I was just wondering if it landed standing
up like that, or you don't know?

A.      I don't know.

Q.      But this is the mannequin that
allegedly fell off the shelf of the
display?

A.      Yes.

Q.      Okay.   And what do the letters
"TC" stand for?   I don't know what that
means.

A.      It's a brand.

Q.    It's a brand of -- I don't want to do what Jason did yesterday.  So that's a brand of what?

A.    It's a brand of lingerie.

Q.    Lingerie.  It's the lingerie department.

A.    That's correct.

Q.    But this is a girl, or you don't even know that?

A.    No.

Q.    Okay.  Do you have any idea what these numbers mean at the bottom of this report or does that take place after you --

A.    That takes place after me.  That's -- that's a file number, I'm assuming.

Q.    Okay.

A.    But I'm assuming.

Q.    You really don't know what that is?

A.    I really don't know.

Q.    Okay.  And do you know what the 8:38 p.m. means?  I think that was 8:38 p.  It looks like your name down here.

A.    Right.  That's after I put it

into the file.  That's when it got brought up there.

Q.    So what time did this accident happen?  I'm sorry.  8:05?

A.    8:05.

Q.    8:05 p.m.  And then this was put into the file at 8:38 p.m.  Would that be the same day?

A.    Yes.

Q.    What time does the store close?  I think this was a Friday, if I remember.

A.    Friday, it would be 9 o'clock.

Q.    So I need you to tell me in a little bit more detail what you did when you got to the scene.  Tell me the order in which you did what.

A.    The first thing I did was check on Ms. Stirgus.

Q.    Check on the customer?

A.    Make sure she was okay.

Q.    All right.  And where was she when you did that?

A.    She was in front of the display still.

Q.    And standing, sitting?

A.   Standing.

Q.   Standing?  Okay.  And you said it looked like she had been crying?

A.   She did look like she had previously been crying.

Q.   And then you said that you-all discussed medical attention and stuff like that.  What did you do after that, after your conversation with her ended?

A.   After it ended, we exchanged information.

Q.   Okay.

A.   According to that form there.

Q.   Okay.  Did you have this on your clipboard?

A.   That's correct.

Q.   So you filled this out at the scene?

A.   That's correct.

Q.   When did you talk to Ms. Landry, before or after talking to the customer?

A.   After the customer.

Q.   Before or after completing your accident report?

MR. CAMELFORD:

Let him finish his answers.

MR. MURA:

I'm sorry.

THE WITNESS:

After the customer, and that was filled out as I'm talking to the customer. But I didn't file it until after I'd taken the pictures and talked to Ms. Landry. But I didn't take the pictures or talk to Ms. Landry until after I talked to the customer.

EXAMINATION BY MR. MURA:

Q.    Okay.  Did you come in contact with the mannequin, touch it, pick it up, move it, put it back on the shelf?  What?

A.    Not that I remember.

Q.    Do you know --

A.    I didn't put it back on the shelf, no.

Q.    You didn't put it back.  Did the -- go ahead.  Finish your answer.

A.    I didn't put it back on the shelf.  It did not go back on the shelf.

Q.    While you were there?

A.    To my knowledge, it did not go

back on the shelf.

Q.    Ever?

A.    Ever.

Q.    How'd you come to know that?

A.    Since the incident happened, you know, we wanted to ensure that the area was going to continue to be safe, so we left it down.

Q.    Left it on the floor?

A.    It was put into storage eventually.

Q.    Oh, okay.  Is it still in storage?

A.    I don't know.

Q.    Did the sales associate move the mannequin while you were there?

A.    I don't know.

Q.    Okay.  So you don't know how it got into the upright position on the floor?

A.    I do not.

Q.    Okay.  Do you know if -- who the owner of that mannequin is?

A.    I could assume Dillard's.

MR. CAMELFORD:

        Object to the form.

MR. MURA:

That's good.  You can say assume.  We understand that.

THE WITNESS:

Okay.

EXAMINATION BY MR. MURA:

Q.  The reason I'm asking is, I need to know if it's Dillard's or an outside company that brings in mannequins and does --

A.  No.

Q.  I've never been in retail.

A.  No.  We take care of the mannequins.

Q.  So, as best, best you know, it was a Dillard's mannequin that was put up by a Dillard's employee?

A.  That's -- to my knowledge, that was before I was there when that mannequin in particular was put there.

Q.  When did you get to the Oakwood store?

A.  I got there in -- I hadn't been there long as of this incident.  So I got there in 2016.

ASSOCIATED REPORTERS, INC./504.529.3355

27

Q. I'm sorry?

A. I got there in the year of 2016.

Q. 2016?

A. Uh-huh (Affirmative Response).

Q. Okay. So, as far as you understand, Dillard's would also -- I don't know what the term is -- dress the mannequins? Good word, huh?

A. Good word, yes.

Q. Dillard's employees do that?

A. Dillard's employees do do that.

Q. Do they have a title or section of the store that do that, called display department or something? I don't know.

A. Typically, the associates in the department would dress the mannequin.

Q. Okay. And who would determine what goes on the mannequins?

A. Either the associate or a business manager or an area sales manager or by directive. It depends on where you are in the store.

Q. Okay. But there is no separate personnel that displays the mannequins, dresses them and puts them up?

A.    Not specifically, no.  They don't -- there's not one person that just dresses mannequins, if that's what you're asking.

Q.    How about setting up the -- we called it two things -- the shelf and the display?  Who would do that or would have done that?

A.    I couldn't tell you who would have done that in particular.

Q.    Would that be Dillard's or outside contractors?

A.    Most likely, again, that one was well before I got there, when that one was put up.

Q.    Do you know anything about the structure of this display?

MR. CAMELFORD:

        Object to form.

THE WITNESS:

        Could you be more specific?

EXAMINATION BY MR. MURA:

Q.    I'm just trying to find out how it's attached to the wall, what supports the shelf, questions like that that I'm

going to ask you.

A.    There are -- if you can look right here, you see there's little anchor points on the wall that run the entire length of the wall.

Q.    Up and down?

A.    Up and down, yeah, yeah.

Q.    Okay.

A.    So they've got anchors in there and that's how we keep --

Q.    And the white board hooks to those, anchor boards?

A.    I wouldn't know what to call them, to be honest, but they are anchor points.

Q.    Anchor points.

A.    Yeah.

Q.    And you're talking about these little metal strips that run up and down ceiling to floor?

A.    Yes.

Q.    What about the shelf?

A.    It would be secured to the anchor points as well in some fashion.

Q.    Okay.  What about the -- what do

ASSOCIATED REPORTERS, INC./504.529.3355

you call the little things that the hangers are put on?

A.    The same.

Q.    Huh?

A.    The same.  They're hooked to the anchor points as well.

Q.    Okay.  So three separate things that -- here, it would be four or five. But the white display board is anchored to the wall.  Is that separate from the shelf?

A.    They are separate, but there are the -- the structure runs from the ceiling down to the floor.

Q.    They're on the same, the same -- what you call it?  The same boards?

A.    Yeah.  They're not really anchor points.

Q.    Anchor.

A.    I'm not sure what to call them. I'm sorry.

Q.    Is the white board connected to the shelf?

A.    I don't know.

Q.    Is the shelf connected to the metal things that hold the clothing?

31

A.      No.

Q.      It's not connected?

A.      No.

Q.      Okay.   And I think it goes with the little brackets that hold the hanging goods, is clipped onto the anchor boards or anchor points, is that how it works, or do you know?

A.      They're all secured to the wall.

Q.      Okay.   How about the mannequin? Is the mannequin secured to the shelf or to the white board behind it?

A.      It is not.

Q.      Do you know how much the mannequin weighs?

A.      No.   I would have to guess.

Q.      Do you know what it's made out of?

A.      It's not a lot to it.   The outside of it is fabric with some kind of padding underneath the fabric.

Q.      Okay.

A.      And it can't be much -- there's not much structure underneath.

Q.      What's your guess of the weight?

32

A.   Definitely less than 10 pounds; anywhere from five to 10 pounds.

Q.   Okay.  Is that -- I don't want to, but is this like a typical type of mannequin that Dillard's uses in stores or --

A.   There's a variety of mannequins. That is typical for that department, yes.

Q.   Thank you.

Were you able to determine the cause of the mannequin falling from the display shelf?

A.   No.

Q.   Was that part of your investigation to do so?

A.   Yes.

Q.   Did -- as part of your investigation, is it also Dillard's protocol to check the videos --

A.   Yes.

Q.   -- of the store?

Did you do that?

A.   Yes.

Q.   When did you do that?

A.   Between talking to the customer,

ASSOCIATED REPORTERS, INC./504.529.3355

after my pictures were taken and before I filed that report.

Q.    So you went to where?  How do you review the video?

A.    We have a computer that stores our video.

Q.    Okay.  So what did you have to do to review the video of this area?

A.    I had to go to that computer, pull up the time frame, and watch the video.

Q.    And did you do that?

A.    Yes.

Q.    And what did that video show you?

A.    Well, the cameras were on a pattern, so they were rotating.

Q.    I saw that.

A.    Yeah.  So it didn't really show much.  It showed the mannequin on the shelf, and then by the time it rotated and made its pass, the mannequin was not on the shelf.  And that's really all that I saw. It's hard to tell what happened from the footage.

Q.    When's the last time you saw the video?  Did you review it?

A.    I did not review it today.

Q.    Okay.  So would it have been back in 2016 or did you review it since then?

A.    I've reviewed it since then. It's been in the last few months that I've reviewed it.

Q.    Okay.  Is Ms. Landry still with the store?

A.    She is not.

Q.    Okay.  Are you -- do you know her, familiar with her?  I know she wasn't in your department, but --

A.    Right.  I mean, I knew who she was.

Q.    Okay.  Okay.

A.    But I didn't know her well, if that's what you're asking.

Q.    No.

A.    Okay.

Q.    My question is, in the video, I see a black female looking toward the display and appears to be talking to

35

someone, and I was wondering if that lady is Ms. Landry.

A.    I don't know.

Q.    Do you remember seeing the lady talking to someone, appear to be talking to someone?

A.    I remember seeing the associate, but I was -- I thought she had another customer that wasn't Ms. Stirgus.

Q.    Okay.

A.    So that could be who it was, but I'm not certain.

Q.    Well, tell me what you saw in the video, then.  Did you see the associate?

A.    I saw the associate at some point pass through the video.

Q.    I'm talking after the mannequin disappears, when it sweeps back and there's no mannequin on the shelf.

A.    I don't remember.

Q.    Okay.  But at sometime before that, you see her dealing with a customer?

A.    Yes.

Q.    So if the answer -- back to the

original question.  Was the young lady --
it appears to be a young lady.  After the
mannequin is gone from the shelf standing
in that general vicinity talking to
somebody, do you know who that was?

A.    No, I don't know.

Q.    Okay.  And I don't want to limit
your answer or misinterpret my question,
but is the mannequin secured to anything?
And I'm not going to only limit to it to
the display shelf or the white panel behind
it.  Is it secured to the wall, to the
anchor, to the ceiling, anything?

MR. CAMELFORD:

        Object to the form.

MR. MURA:

        I'm sorry?

MR. CAMELFORD:

        Object to form.

MR. MURA:

        Okay.

THE WITNESS:

        No.

EXAMINATION BY MR. MURA:

Q.    And I can't tell.  Is there a

ASSOCIATED REPORTERS, INC./504.529.3355

lip or an edge to this shelf, you know what I'm talking about, or is it just one level?

A.    It doesn't appear to have a lip or a ledge.

Q.    If you're looking at the picture with me?

A.    Correct.

Q.    Other than the picture, do you have any knowledge or the recollection of the shelf having that?

A.    I don't recall it having any type of lip or a ledge.

Q.    And you said you started there 2015. All right. Okay. No, early 2016. I'm sorry.

A.    Correct.

Q.    Are you aware of any other incidents involving mannequins or displays falling?

A.    No.

Q.    First time it happened?

A.    Yes.

Q.    And if I wanted to know the frequency with which mannequins and the displays or the dressings on the mannequins

are changed, I would -- particularly in the lingerie department, I should talk to the -- who should I talk to? The business manager and the associate in that department, right?

A.    Yes.

Q.    Do you know if there's any records kept of the mannequins and displays and the protocol for changing them out?

A.    Not to my knowledge.

Q.    Okay. Besides the mannequin, was there anything else on the shelf?

A.    No.

Q.    And I'm particularly asking about this. I'm not sure what that is to the left of the -- whatever the white board is called, but to the left of that. What is that?

A.    That is another bar that has lingerie hanging on it. It's not actually attached to the fixture.

Q.    That's not something on the shelf?

A.    No.

Q.    Oh, that's like a shadow or

something.  Okay.  That's not a base of something?

A.    No.

Q.    Okay.  Hold on one second.

Okay.  As far as you know, was there ever a further investigation to determine the cause of this mannequin falling from the shelf?

A.    There was no new information to my knowledge to help determine that.

Q.    But did anybody other than you try to determine the cause of this fall?

A.    No.  That was my job.

Q.    That was your job?

A.    Yes.

Q.    And so the investigation basically ended with what we've just talked about, plus the review of the video?

A.    Correct.

Q.    And then you saved the video. Is that part of the protocol?

A.    Yes.

Q.    And I don't know where I got this from, but that was an unusual type of video because of the way it was -- it

40

looked like it was pre-programmed, is that right? Because it did some -- it did some strange turns. I don't know. But it was very unusual. I've seen a lot of surveillance video and most of its stationary, but this is like a moving eye in the sky, if you know what I'm talking about. So what's with the video?

A.   So it is pre-programmed --

Q.   Yes.

A.   -- in order for the camera to cover the entire department.

Q.   Okay.

A.   That has a pattern that it follows.

Q.   Okay. It took me a few loops to figure that out. But is the video monitored?

A.   There is someone monitoring all the cameras.

Q.   And so I got the impression that's a lot of cameras. How many cameras are we talking about, best estimate?

A.   Approximately, 30.

Q.   Thirty cameras?

A.    Correct.

Q.    So he's got 30 screens in front of him at one time, him or her?  I shouldn't say that.

A.    There are 30 screens and then there are two view screens that -- primary view screens.

Q.    What's that mean?

A.    So they can watch, they can see all the cameras on all the monitors or they can pull up a specific camera on their view screen, their main view screen in order to operate the camera if needed.

Q.    So would what you call that person?

A.    The camera operator.

Q.    Camera operator.  Good name.

Would he be able to select a particular camera, like the one that you viewed, the video of in the store, and take it off of remote control, automatic pilot onto some kind of self-directed remote control?

A.    Yes.

Q.    He could do that if he wanted

to?

A.    Yes.

Q.    So, as far as you know, as of today, Dillard's has no explanation for why this thing, this mannequin, fell off the shelf?

A.    It had been there for years and hadn't fallen off and there was no information given when I approached the customer as to what could have caused it to fall at that time.

Q.    Okay.  Do you have any information to indicate that the customer somehow caused this to fall?

A.    The only indication that would have, to me, would have been the children playing.  Like I said, the boy was really excited to see me and my clipboard and tried to take my clipboard from me.  So I would be assuming that they could have been the cause of it.  But it would have taken force to make that mannequin fall.

Q.    Take some force to make it fall?

A.    Right.

Q.    Okay.  Did you see any evidence

43

of the children having caused it?

A.    No.

Q.    I mean, other than the child reacting to your clipboard, anything else?

A.    No.

Q.    Did you talk to the kids?

A.    Other than hello, how are you, no. My main concern was Ms. Stirgus because she was the one that was potentially injured.

Q.    Okay. The associate, I think she used the term in here, she said she heard a boom. Were you able to determine what was that boom all about?

A.    No. I can assume it was the mannequin falling. But it could have been anything.

Q.    Okay. What is -- you're familiar with the store. What is behind this wall?

A.    The --

Q.    That the display is on.

A.    The juniors department.

Q.    The junior department. So if I were to go around and look, try to look at

the back of this white display board, what would I see?

A.    If you were to walk, walk on the other side of the wall, is that what you're asking?

Q.    Yes.  I'm trying to see the back of this wall, what's behind it.

A.    It looks similar to that, except it's juniors clothing on the other side.

Q.    And how was the junior clothing displayed?

A.    I don't recall.  That was a long time ago.

Q.    Okay.  So that is -- if I remember, I think the shoe department is to the left of these pictures?

A.    If you're looking --

Q.    I'm looking at this picture with the display and the shelf.  If you're looking at this picture with the display and the shelf, the shoes is to your right?

A.    To my right.

Q.    What did you call it, the junior department?

A.    Yes.

Q.   Is it still set up today that way?

A.   I couldn't tell you if it's set up similarly today or not.

Q.   No.  No.  No.  I mean, is it -- in 2016 and today, you're telling me that this is the lingerie and the junior department is on the other side?

A.   Yes.

Q.   Is it still a junior department?

A.   Yes.

Q.   I understand displays, they come and go and change with the wind, but --

A.   It is still a juniors department, yes.

Q.   All right.  Do you know of anything that took place in the junior department to cause this to fall?

A.   Not to my knowledge.

MR. MURA:

I think that's all I have for you, Mr. Boone.  Any questions?

MR. CAMELFORD:

Yeah, Lee.  I got a couple of questions for you to follow up.

46

EXAMINATION BY MR. CAMELFORD:

Q.      How many customers come to your Dillard's store each year?

A.      A lot; tens of thousands.

Q.      And how many similar mannequins throughout the store are there to the one that's depicted in this picture here of the mannequin you took?

A.      Again, a lot would be guessing, but dozens would be, you know, a close estimate.

Q.      Are you aware of any one of those mannequins ever falling or being knocked over in a similar way to what the plaintiff's alleging in this case?

MR. MURA:

I'm going to object to the form.

THE WITNESS:

Not to my knowledge.

EXAMINATION BY MR. CAMELFORD:

Q.      Have you ever heard of one of them falling?

A.      No.

Q.      Have you ever heard of the mannequin that was in this display falling

before?

A.    No.    That one has not fallen and it had been there for at least three years.

Q.    Do you have any -- I know you said that the little boy was grabbing at your clipboard.    How would you describe his behavior while you were interacting with Ms. Stirgus?

A.    Hyper would be the short answer. He was, you know, having fun and enjoying himself.

Q.    What was he doing?    Was he standing still, running around?

A.    He was definitely running around.    He ran up to me.    He was the first one to get to me when I came to the department.    And, you know, he was even interested enough in my clipboard to grab at my clipboard.

MR. CAMELFORD:

I don't have any more questions for you, Lee.

MR. MURA:

I don't have any more.    Thank you.

48

REPORTER'S CERTIFICATE

I, ROBERT K. TUCKER, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that the above-mentioned witness, after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth;

That the testimony was reported by me in stenotype and transcribed under my personal direction and supervision, and is a true and correct transcript, to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board;

That I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I am not of counsel, not

related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

This certificate is valid only for transcript accompanied by my original signature and original required seal on this page.

ROBERT E. TUCKER
CERTIFIED COURT REPORTER
STATE OF LOUISIANA
CERTIFICATE NO. 87307

ASSOCIATED REPORTERS, INC./504.529.3355

## A

**able (3)**
32:10;41:18;43:13
**accident (18)**
8:9;11:18;12:13;
13:14;14:20;15:1,13;
16:10,15;18:13,16,18,
23,23,24;19:2;22:3;
23:24
**accordance (1)**
4:8
**According (1)**
23:13
**actually (1)**
38:20
**address (2)**
5:10;13:19
**administering (1)**
4:24
**Affirmative (3)**
6:19;10:18;27:4
**aforementioned (1)**
4:5
**again (3)**
14:7;28:13;46:9
**ago (1)**
44:13
**agreed (1)**
4:3
**ahead (2)**
6:7;24:21
**allegedly (1)**
20:19
**alleging (1)**
46:15
**anchor (11)**
29:3,12,14,16,24;
30:6,16,18;31:6,7;
36:13
**anchored (1)**
30:9
**anchors (1)**
29:9
**announce (1)**
12:17
**answered (1)**
12:14
**appear (2)**
35:5;37:3
**appears (2)**
34:25;36:2
**approached (1)**
42:9
**Approximately (1)**
40:24
**area (27)**
6:6,7,17,20,22;7:11,
17,21;8:11,15,17,22;
9:3,9,11,24,25;12:3;
13:8,14;14:17;17:1,7;
18:1;25:6;27:20;33:8

**areas (2)**
7:22,25
**around (4)**
13:15;43:25;47:13,
15
**arrived (2)**
13:8;19:10
**ASM (1)**
6:18
**assist (1)**
11:23
**assistance (1)**
10:25
**assistant (3)**
9:19,23;11:21
**associate (12)**
10:23;11:9,11,12;
20:3;25:15;27:19;35:7,
15,16;38:4;43:11
**associates (1)**
27:15
**assume (4)**
19:11;25:23;26:3;
43:15
**assuming (3)**
21:16,18;42:20
**attached (2)**
28:24;38:21
**attention (5)**
14:3,8,11;16:24;23:7
**attorney (1)**
5:14
**automatic (1)**
41:21
**aware (2)**
37:17;46:12

## B

**back (17)**
5:17;6:13,15;7:16;
8:25;16:8;24:15,18,20,
22,23;25:1;34:5;35:19,
25;44:1,6
**bar (1)**
38:19
**base (1)**
39:1
**basically (3)**
17:20;18:4;39:17
**become (1)**
8:8
**behavior (1)**
47:7
**behind (4)**
31:12;36:11;43:19;
44:7
**Belleville (1)**
5:11
**below (2)**
8:22;9:25
**Besides (1)**
38:11

**best (4)**
18:25;26:15,15;
40:23
**Bill (1)**
5:13
**bit (1)**
22:14
**black (1)**
34:24
**board (6)**
29:11;30:9,21;31:12;
38:16;44:1
**boards (3)**
29:12;30:15;31:6
**body (1)**
18:18
**boom (2)**
43:13,14
**BOONE (4)**
5:1,7,8;45:22
**bottles (1)**
20:13
**bottom (1)**
21:12
**boy (3)**
13:16;42:17;47:5
**brackets (1)**
31:5
**brand (4)**
20:25;21:1,3,4
**brings (1)**
26:9
**brought (1)**
22:1
**budgeting (2)**
7:4,6
**business (9)**
8:19,21,25;9:4,10,15,
24;27:20;38:3

## C

**call (8)**
19:20;20:2;29:13;
30:1,15,19;41:14;
44:23
**called (4)**
14:20;27:13;28:6;
38:17
**came (3)**
10:4,20;47:16
**CAMELFORD (10)**
12:8;23:25;25:24;
28:18;36:14,18;45:23;
46:1,20;47:20
**camera (6)**
40:11;41:11,13,16,
17,19
**cameras (6)**
33:16;40:20,22,22,
25;41:10
**Can (9)**
16:9;18:23,25;26:2;

29:2;41:9,9,11;43:15
**capacity (1)**
6:4
**care (1)**
26:13
**case (5)**
9:14;14:10;15:25;
19:1;46:15
**cases (2)**
7:14,15
**cause (7)**
18:16,22;32:11;39:7,
12;42:21;45:18
**caused (5)**
18:24;19:2;42:10,14;
43:1
**ceiling (3)**
29:20;30:12;36:13
**certain (4)**
7:21,22;12:18;35:12
**certification (1)**
4:10
**Certified (1)**
4:21
**change (1)**
45:13
**changed (1)**
38:1
**changing (1)**
38:9
**Check (4)**
16:25;22:17,19;
32:19
**child (1)**
43:3
**children (2)**
42:16;43:1
**Civil (1)**
4:7
**claims (1)**
5:15
**clipboard (8)**
13:17;23:15;42:18,
19;43:4;47:6,18,19
**clipped (1)**
31:6
**close (2)**
22:10;46:10
**closing (1)**
7:8
**clothing (3)**
30:25;44:9,10
**code (2)**
11:19;12:4
**commercial (1)**
20:14
**company (3)**
16:3,4;26:9
**complete (2)**
15:17;18:6
**completing (2)**
18:14;23:23
**computer (2)**

33:5,9
**concern (2)**
14:1;43:8
**concerned (1)**
18:15
**connected (3)**
30:21,24;31:2
**considered (1)**
10:15
**contact (1)**
24:13
**continue (2)**
14:12;25:7
**contractors (1)**
28:12
**control (2)**
41:21,23
**conversation (1)**
23:9
**counsel (1)**
4:4
**couple (1)**
45:24
**course (3)**
7:9;13:9;14:1
**Court (1)**
4:21
**cover (1)**
40:12
**creates (1)**
15:24
**crying (3)**
13:25;23:3,5
**customer (23)**
8:13;10:24,25;11:23;
13:5;14:20;16:11,17,
21,25;17:13;19:2;
22:19;23:21,22;24:5,6,
11;32:25;35:9,23;
42:10,13
**customers (2)**
7:9;46:2
**customer's (2)**
13:11;17:5

## D

**damage (1)**
18:19
**date (1)**
16:1
**day (1)**
22:8
**dealing (1)**
35:23
**Definitely (2)**
32:1;47:14
**department (23)**
8:9,14;9:13;10:24;
11:13;13:2;21:6;27:14,
16;32:8;34:15;38:2,5;
40:12;43:23,24;44:15,
24;45:8,10,15,18;47:17

departments (1)
7:22
depends (1)
27:21
depicted (2)
20:9;46:7
deposition (2)
4:5,16
describe (1)
47:6
detail (1)
22:14
determine (9)
16:8;19:1,8;27:17;
32:10;39:7,10,12;
43:13
dial (2)
12:18,20
Dillard's (20)
5:16;6:2,22;7:18;
10:6,7;16:10,16;25:23;
26:8,16,17;27:6,10,11;
28:11;32:5,18;42:4;
46:3
direction (1)
9:11
directive (1)
27:21
directly (1)
9:16
disappears (1)
35:19
discussed (1)
23:7
display (17)
19:15,21,22;20:20;
22:23;27:13;28:7,17;
30:9;32:12;34:25;
36:11;43:22;44:1,19,
20;46:25
displayed (1)
44:11
displays (6)
7:12;27:24;37:18,25;
38:8;45:12
doctor (1)
14:5
done (3)
15:20;28:8,10
down (8)
7:11;10:16;21:24;
25:8;29:6,7,19;30:13
dozens (1)
46:10
dress (2)
27:7,16
dresses (2)
27:25;28:3
dressings (1)
37:25
drive (2)
6:25;7:1
duly (1)

5:2
duty (2)
8:12;11:2

**E**

early (1)
37:14
edge (1)
37:1
effect (1)
16:12
either (2)
9:25;27:19
else (3)
16:19;38:12;43:4
employed (1)
6:2
employee (1)
26:17
employees (2)
27:10,11
ended (3)
23:9,10;39:17
enjoying (1)
47:10
enough (3)
11:6;14:13;47:18
ensure (1)
25:6
entire (3)
7:23;29:4;40:12
estimate (2)
40:23;46:11
even (2)
21:9;47:17
event (1)
13:9
eventually (2)
10:9;25:11
everyone (1)
17:1
evidence (2)
4:17;42:25
EXAMINATION (8)
5:4;12:11;24:12;
26:6;28:22;36:24;46:1,
20
examined (1)
5:2
except (1)
44:8
exchanged (1)
23:10
excited (1)
42:18
expansive (1)
6:24
explanation (1)
42:4
extent (1)
15:9
eye (1)

40:6

**F**

fabric (2)
31:20,21
fall (8)
8:18,19;39:12;42:11,
14,22,23;45:18
fallen (3)
19:9;42:8;47:2
falling (7)
32:11;37:19;39:8;
43:16;46:13,22,25
familiar (2)
34:14;43:19
far (4)
15:20;27:5;39:5;
42:3
fashion (1)
29:24
Federal (1)
4:7
fell (5)
19:3,7,12;20:19;42:5
felt (1)
14:13
female (1)
34:24
few (2)
34:8;40:16
figure (1)
40:17
file (8)
15:19,23,25;18:7;
21:15;22:1,7;24:7
filed (2)
14:17;33:2
filing (2)
4:10;18:15
fill (3)
16:18;17:11,25
filled (3)
15:14;23:17;24:6
find (1)
28:23
finish (2)
24:1,21
finishes (1)
12:9
first (5)
5:2;16:20;22:17;
37:21;47:15
Five (4)
7:19,20;30:8;32:2
fixture (1)
38:21
floor (4)
25:9,19;29:20;30:13
follow (1)
45:25
follows (2)
5:3;40:15

footage (1)
33:25
force (2)
42:22,23
form (9)
4:13;16:18;17:11;
23:13;25:25;28:19;
36:15,19;46:17
formalities (1)
4:9
forms (1)
18:7
four (1)
30:8
frame (1)
33:10
frequency (1)
37:24
Friday (2)
22:11,12
front (2)
22:23;41:2
fun (1)
47:10
further (1)
39:6

**G**

gather (1)
13:10
general (2)
13:14;36:4
girl (1)
21:8
given (2)
14:24;42:9
goes (3)
18:7;27:18;31:4
good (5)
11:6;26:2;27:8,9;
41:17
goods (1)
31:6
grab (1)
47:18
grabbing (1)
47:5
guess (2)
31:16,25
guessing (1)
46:9

**H**

handle (2)
8:13;15:19
hangers (1)
30:1
hanging (2)
31:5;38:20
happen (1)
22:4

happened (8)
11:1,16;13:9,14;
14:6;25:5;33:24;37:21
happens (1)
18:10
hard (1)
33:24
Hattiesburg (1)
10:8
heard (3)
43:13;46:21,24
hello (1)
43:7
help (1)
39:10
helping (1)
7:9
hereby (2)
4:6,14
hereto (1)
4:4
hierarchy (1)
9:6
higher (1)
10:17
himself (1)
47:11
hold (3)
30:25;31:5;39:4
honest (1)
29:14
hooked (1)
30:5
hooks (1)
29:11
hours (1)
7:7
How'd (2)
8:8;25:4
huh (2)
27:8;30:4
hurt (1)
18:18
Hyper (1)
47:9

**I**

idea (1)
21:11
immediate (1)
14:1
impression (1)
40:21
incident (8)
5:16;6:13;10:20,21;
11:1;13:4;25:5;26:24
incidents (1)
37:18
include (1)
7:10
indicate (1)
42:13

Sonya Stirgus v.
Dillard Department Stores, Inc

Walter Boone
June 20, 2018

indication (1)
  42:15
information (9)
  13:10;14:9,10;15:25;
  17:6;23:11;39:9;42:9,
  13
injured (1)
  43:10
injury (1)
  18:19
insurance (2)
  16:3,3
interacting (1)
  47:7
intercom (1)
  12:18
interested (2)
  13:16;47:18
into (5)
  18:7;22:1,7;25:10,19
inventory (2)
  7:3,7
investigate (1)
  18:22
Investigation (9)
  14:21;15:2;16:10,15;
  18:13;32:15,18;39:6,
  16
involved (1)
  8:8
involves (2)
  16:11,16
involving (2)
  13:5;37:18
issues (1)
  8:13

**J**

Jason (1)
  21:2
job (3)
  6:25;39:13,14
junior (6)
  43:24;44:10,23;45:7,
  10,17
juniors (3)
  43:23;44:9;45:14

**K**

keep (1)
  29:10
kept (1)
  38:8
Kiara (1)
  11:3
kids (4)
  13:13,15;20:13;43:6
kids' (1)
  8:5
kind (5)
  13:4,15;16:2;31:20;

41:22
knew (1)
  34:16
knocked (1)
  46:14
knowledge (9)
  18:8;20:5;24:25;
  26:18;37:9;38:10;
  39:10;45:19;46:19

**L**

Ladies' (1)
  8:4
lady (7)
  5:15;13:12,20;35:1,
  4;36:1,2
landed (1)
  20:15
Landry (11)
  11:4,5,6;12:23;
  15:14;17:22;23:20;
  24:8,10;34:10;35:2
last (2)
  34:1,8
later (1)
  16:1
law (1)
  4:8
least (1)
  47:3
ledge (2)
  37:4,12
Lee (2)
  45:24;47:22
left (5)
  25:7,9;38:16,17;
  44:16
length (1)
  29:5
less (1)
  32:1
letters (1)
  20:22
level (1)
  37:2
likely (1)
  28:13
limit (2)
  36:7,10
lingerie (14)
  8:6,9,14;9:13,14,16;
  11:13;13:2;21:4,5,5;
  38:2,20;45:7
lip (3)
  37:1,3,12
little (8)
  13:16;20:12;22:14;
  29:3,19;30:1;31:5;47:5
long (3)
  19:18;26:24;44:12
look (6)
  7:2;16:7;23:4;29:2;

43:25,25
looked (3)
  13:24;23:3;40:1
looking (5)
  34:24;37:5;44:17,18,
  20
looks (2)
  21:24;44:8
loops (1)
  40:16
lot (5)
  31:19;40:4,22;46:4,9
Louisiana (2)
  4:23;5:12

**M**

main (3)
  6:25;41:12;43:8
Mall (1)
  6:11
manager (26)
  6:6,7,17,20,22;8:1,
  15,18,20,21,23,25;9:3,
  10,11,12,15,17,19,20,
  23,23;12:3;27:20,20;
  38:4
managers (8)
  7:17;8:11;9:4,4,24,
  25;10:1;11:2
mannequin (34)
  10:22;19:5,6,7,9,23,
  24;20:3,6,18;24:14;
  25:16,22;26:16,19;
  27:16;31:10,11,15;
  32:5,11;33:20,22;
  35:18,20;36:3,9;38:11;
  39:7;42:5,22;43:16;
  46:8,25
mannequins (14)
  7:12;26:9,14;27:8,
  18,24;28:3;32:7;37:18,
  24,25;38:8;46:5,13
many (5)
  7:16,17;40:22;46:2,5
may (2)
  4:16;10:7
mean (10)
  6:21;7:21;11:10;
  15:22;20:12;21:12;
  34:16;41:8;43:3;45:5
means (2)
  20:24;21:23
medical (5)
  14:3,8,11;16:23;23:7
men's (1)
  8:4
metal (2)
  29:19;30:25
misinterpret (1)
  36:8
Mississippi (3)
  10:8,12,14

monitored (1)
  40:18
monitoring (1)
  40:19
monitors (1)
  41:10
months (1)
  34:8
more (6)
  14:14;18:21;22:14;
  28:21;47:21,24
Most (2)
  28:13;40:5
move (3)
  20:3;24:15;25:15
moving (1)
  40:6
much (4)
  31:14,23,24;33:20
MURA (14)
  5:4,13;12:11;24:2,
  12;26:1,6;28:22;36:16,
  20,24;45:20;46:16;
  47:23
M-U-R-A (1)
  5:14

**N**

name (6)
  5:5,13;13:18,19;
  21:24;41:17
need (11)
  11:22;13:19;14:3,4,
  8,10;15:25;16:23;17:6;
  22:13;26:7
needed (3)
  7:9;10:25;41:13
New (4)
  5:11;10:10,13;39:9
noticed (2)
  13:17,23
number (5)
  12:18,20;15:5,6;
  21:15
numbers (1)
  21:12

**O**

Oakwood (6)
  5:16;6:9,10,11,23;
  26:21
oath (1)
  4:24
Object (5)
  25:25;28:19;36:15,
  19;46:17
objections (1)
  4:12
o'clock (1)
  22:12
October (6)

5:17;6:13,16;7:16;
  8:25;16:12
off (4)
  20:19;41:21;42:5,8
officiated (1)
  4:23
old (1)
  5:8
Once (1)
  12:14
one (17)
  8:11;11:1;15:9;18:1;
  28:2,13,14;37:2;39:4;
  41:3,19;43:9;46:6,12,
  21;47:2,16
only (3)
  18:1;36:10;42:15
onto (2)
  31:6;41:22
opening (1)
  7:7
operate (1)
  41:13
operator (7)
  10:24;12:15,21,22;
  13:1;41:16,17
order (3)
  22:15;40:11;41:12
original (1)
  36:1
Orleans (4)
  4:22;5:12;10:10,13
out (10)
  15:14;16:18;17:11,
  25;23:17;24:6;28:23;
  31:17;38:9;40:17
outside (3)
  26:8;28:12;31:20
over (3)
  11:24;12:17;46:14
owner (1)
  25:22

**P**

padding (1)
  31:21
page (8)
  11:2,15,17,24;12:14,
  16,25;15:9
panel (1)
  36:11
paperwork (2)
  11:22;15:13
Parish (1)
  4:22
part (5)
  4:16;15:1;32:14,17;
  39:21
particular (4)
  15:4;26:20;28:10;
  41:19
particularly (3)

16:11;38:1,14
**parties (1)**
  4:4
**parts (1)**
  18:18
**pass (2)**
  33:22;35:17
**pattern (2)**
  33:17;40:14
**person (2)**
  28:2;41:15
**personnel (5)**
  7:3,5,6,7;27:24
**photograph (1)**
  20:10
**pick (1)**
  24:14
**picture (7)**
  19:15,19;37:5,8;
  44:18,20;46:7
**pictures (7)**
  14:15,24;16:18;24:8,
  9;33:1;44:16
**piece (1)**
  15:12
**pilot (1)**
  41:21
**place (5)**
  19:11,13;21:13,14;
  45:17
**plaintiff's (1)**
  46:15
**playing (1)**
  42:17
**please (1)**
  5:6
**plus (1)**
  39:18
**pm (3)**
  21:23;22:6,7
**point (2)**
  13:25;35:17
**points (7)**
  29:4,15,16,24;30:6,
  17;31:7
**position (3)**
  6:15;20:9;25:19
**potentially (1)**
  43:10
**pounds (2)**
  32:1,2
**pre-programmed (2)**
  40:1,9
**present (1)**
  5:10
**pretty (1)**
  6:24
**previously (1)**
  23:5
**primary (1)**
  41:6
**Procedure (1)**
  4:7

**promotion (1)**
  10:16
**protocol (8)**
  15:2;16:10,16;18:3,
  14;32:19;38:9;39:21
**pull (3)**
  16:1;33:10;41:11
**purposes (1)**
  4:8
**put (12)**
  18:4;21:25;22:6;
  24:15,18,20,22;25:10;
  26:16,20;28:15;30:2
**puts (1)**
  27:25

**R**

**ran (1)**
  47:15
**reacting (1)**
  43:4
**reading (1)**
  4:9
**really (7)**
  13:16;21:19,21;
  30:16;33:19,23;42:17
**reason (1)**
  26:7
**recall (2)**
  37:11;44:12
**recollection (1)**
  37:9
**record (1)**
  5:6
**records (1)**
  38:8
**remember (7)**
  20:11;22:11;24:16;
  35:4,7,21;44:15
**remote (2)**
  41:21,22
**report (10)**
  8:10;9:22;12:3;
  14:18,21;15:10,18;
  21:13;23:24;33:2
**reported (1)**
  16:2
**Reporter (1)**
  4:22
**reporting (1)**
  9:16
**reports (1)**
  18:15
**represent (1)**
  5:14
**required (1)**
  14:16
**reserved (1)**
  4:15
**Response (3)**
  6:19;10:18;27:4
**responsiveness (1)**

  4:14
**rest (2)**
  16:9;18:3
**retail (1)**
  26:12
**review (6)**
  33:4,8;34:2,3,5;
  39:18
**reviewed (2)**
  34:7,9
**right (17)**
  6:1,18;7:2,23;10:19;
  15:8;21:25;22:21;29:3;
  34:16;37:14;38:5;40:2;
  42:24;44:21,22;45:16
**ROBERT (1)**
  4:21
**rotated (1)**
  33:21
**rotating (1)**
  33:17
**Rules (1)**
  4:7
**run (2)**
  29:4,19
**running (3)**
  13:15;47:13,14
**runs (1)**
  30:12

**S**

**safe (6)**
  17:1,2,4,7,9;25:7
**S-A-F-E (1)**
  17:9
**sales (23)**
  6:6,7,17,20,22,25;
  7:1,17,21,25;8:15,17,
  23;9:4,9,12,24,25;
  11:12;12:3;20:3;25:15;
  27:20
**Same (7)**
  6:17;22:8;30:3,5,14,
  14,15
**save (1)**
  4:12
**saved (2)**
  17:8;39:20
**saw (5)**
  33:18,23;34:1;35:13,
  16
**saying (1)**
  12:2
**scene (3)**
  20:4;22:15;23:18
**scheduling (2)**
  7:4,5
**screen (2)**
  41:12,12
**screens (4)**
  41:2,5,6,7
**sealing (1)**

  4:10
**second (1)**
  39:4
**secret (1)**
  11:19
**secretary (1)**
  15:24
**secrets (1)**
  12:7
**section (2)**
  19:23;27:12
**secured (5)**
  29:23;31:9,11;36:9,
  12
**seeing (2)**
  35:4,7
**seek (1)**
  14:10
**select (1)**
  41:18
**self-directed (1)**
  41:22
**separate (4)**
  27:23;30:7,10,11
**servicing (1)**
  16:3
**set (2)**
  45:1,3
**setting (2)**
  7:11;28:5
**several (1)**
  18:17
**shadow (1)**
  38:25
**shelf (30)**
  19:14,15,21;20:19;
  24:15,19,23,23;25:1;
  28:6,25;29:22;30:10,
  22,24;31:11;32:12;
  33:21,23;35:20;36:3,
  11;37:1,10;38:12,23;
  39:8;42:6;44:19,21
**shelf-like (1)**
  19:23
**shoe (1)**
  44:15
**Shoes (6)**
  8:2,3,4,4,5;44:21
**shopping (1)**
  14:12
**short (1)**
  47:9
**show (2)**
  33:14,19
**showed (1)**
  33:20
**side (4)**
  10:1;44:4,9;45:8
**signing (1)**
  4:10
**similar (3)**
  44:8;46:5,14
**similarly (1)**

  45:4
**sitting (1)**
  22:25
**six (2)**
  7:19,20
**sky (1)**
  40:7
**somebody (2)**
  14:5;36:5
**somehow (1)**
  42:14
**someone (4)**
  35:1,5,6;40:19
**sometime (1)**
  35:22
**sorry (10)**
  9:10;10:5;13:18;
  16:14;22:4;24:3;27:1;
  30:20;36:17;37:15
**Sort (2)**
  12:5,6
**sought (1)**
  4:17
**speaker (1)**
  11:25
**specific (3)**
  18:21;28:21;41:11
**specifically (2)**
  4:11;28:1
**stand (1)**
  20:23
**standing (6)**
  20:15;22:25;23:1,2;
  36:3;47:13
**stands (1)**
  20:14
**start (1)**
  10:5
**started (2)**
  10:7;37:13
**State (1)**
  4:23
**statement (4)**
  15:14;17:19,21,25
**stationary (1)**
  40:6
**still (11)**
  6:1,10,11;13:13;
  22:24;25:12;34:10;
  45:1,10,14;47:13
**stipulated (1)**
  4:3
**Stirgus (8)**
  5:15;13:22,23,24;
  22:18;35:9;43:8;47:8
**storage (2)**
  25:10,13
**store (24)**
  6:8;7:8,8,22,23;9:7,
  17,19,19;11:25;12:7;
  14:14;15:24;16:17;
  22:10;26:22;27:13,22;
  32:21;34:11;41:20;

43:19;46:3,6
**stores (2)**
32:5;33:5
**strange (1)**
40:3
**Street (1)**
5:11
**strips (1)**
29:19
**structure (3)**
28:17;30:12;31:24
**stuff (3)**
7:12;18:19;23:7
**supports (1)**
28:24
**sure (10)**
7:2;12:9;13:11;14:8,
9;16:21;17:7;22:20;
30:19;38:15
**surveillance (1)**
40:5
**sweeps (1)**
35:19
**sworn (1)**
5:2
**system (1)**
11:25

## T

**Talk (10)**
12:21,22,23;17:15,
22;23:20;24:9;38:2,3;
43:6
**talked (4)**
13:1;24:8,10;39:17
**talking (15)**
9:12;17:13;19:25;
23:21;24:6;29:18;
32:25;34:25;35:5,5,18;
36:4;37:2;40:7,23
**TC (1)**
20:23
**telling (1)**
45:6
**tens (1)**
46:4
**term (2)**
27:7;43:12
**testified (1)**
5:3
**thereof (1)**
4:16
**Thirty (1)**
40:25
**Thirty-three (1)**
5:9
**thought (1)**
35:8
**thousands (1)**
46:4
**three (4)**
14:23;15:4;30:7;

47:3
**throughout (1)**
46:6
**title (1)**
27:12
**today (6)**
10:21;34:3;42:4;
45:1,4,6
**together (2)**
11:23;18:5
**told (3)**
13:1;14:11;19:17
**took (6)**
14:9,15;19:20;40:16;
45:17;46:8
**touch (1)**
24:14
**toward (1)**
34:24
**tried (1)**
42:19
**try (2)**
39:12;43:25
**trying (2)**
28:23;44:6
**TUCKER (1)**
4:21
**turns (1)**
40:3
**two (5)**
8:11;11:2;13:13;
28:6;41:6
**type (4)**
18:17;32:4;37:12;
39:24
**types (1)**
18:18
**typical (2)**
32:4,8
**Typically (1)**
27:15

## U

**under (4)**
4:6;8:17,19;9:11
**underneath (2)**
31:21,24
**unusual (2)**
39:24;40:4
**up (20)**
7:11;13:12;18:14;
20:14,16;22:2;24:14;
26:16;27:25;28:5,15;
29:6,7,19;33:10;41:11;
45:1,4,25;47:15
**upright (1)**
25:19
**use (2)**
11:20;12:3
**used (3)**
4:17,17;43:12
**uses (1)**

32:5

## V

**variety (1)**
32:7
**vicinity (1)**
36:4
**video (16)**
33:4,6,8,11,14;34:2,
23;35:14,17;39:18,20,
25;40:5,8,17;41:20
**videos (1)**
32:19
**view (4)**
41:6,7,11,12
**viewed (1)**
41:20
**volume (1)**
10:17

## W

**waived (1)**
4:11
**walk (3)**
13:12;44:3,3
**wall (9)**
28:24;29:4,5;30:10;
31:9;36:12;43:20;44:4,
7
**WALTER (2)**
5:1,7
**watch (2)**
33:10;41:9
**way (4)**
10:10;39:25;45:2;
46:14
**weighs (1)**
31:15
**weight (1)**
31:25
**well- (1)**
13:25
**what'd (1)**
19:20
**What's (8)**
13:18,18;15:20;18:2;
31:25;40:8;41:8;44:7
**When's (1)**
34:1
**white (7)**
29:11;30:9,21;31:12;
36:11;38:16;44:1
**wind (1)**
45:13
**witness (8)**
4:6,24;15:14;24:4;
26:4;28:20;36:22;
46:18
**witnesses (1)**
17:16
**wondering (2)**

20:15;35:1
**word (2)**
27:8,9
**work (2)**
6:5,9
**worked (1)**
10:10
**works (1)**
31:7
**write (2)**
17:18,21
**wrote (1)**
15:10

## Y

**year (2)**
27:2;46:3
**years (2)**
42:7;47:3
**yesterday (1)**
21:2
**you-all (1)**
23:6
**young (2)**
36:1,2

## 1

**10 (2)**
32:1,2

## 2

**2014 (1)**
10:8
**2015 (1)**
37:14
**2016 (11)**
5:17;6:16;7:17;9:1;
16:13;26:25;27:2,3;
34:5;37:14;45:6
**21st (1)**
5:17

## 3

**3 (1)**
12:4
**30 (3)**
40:24;41:2,5
**333 (1)**
5:11

## 7

**70114 (1)**
5:12

## 8

**8:05 (3)**
22:4,5,6

**8:38 (3)**
21:23,23;22:7

## 9

**9 (1)**
22:12