1

                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA


SONYA STIRGUS          *   NO.: 17-11645

VERSUS                 *   JUDGE: IVAN L.R. LEMELLE

DILLARD DEPARTMENT   *   MAGISTRATE: JANIS VAN MEERVELD
STORES, INC.
* * * * * * * * * * * * * * * * * * * * * * * * *

          The deposition of SONYA STIRGUS, taken in

     connection with the captioned cause, pursuant

     to the following stipulations before Cynthia M.

     Hare, Certified Court Reporter, at 320 North

     Carrollton Avenue, Suite 200, New Orleans,

     Louisiana 70119, on the 19th day of June 2018,

     beginning at 2:16 p.m.

Exhibit "B"

2

APPEARANCES:


FOR THE PLAINTIFF, SONYA STIRGUS:

     WILLIAM E. MURA, JR., ESQUIRE
     THE LAW OFFICES OF W. A. "CHIP" FORSTALL, JR.
     320 North Carrollton Avenue, Suite 200
     New Orleans, Louisiana 70119


FOR THE DEFENDANT, DILLARD DEPARTMENT STORES, INC.:

     JASON A. CAMELFORD, ESQUIRE
     GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
     4040 One Shell Square
     701 Poydras Street
     New Orleans, Louisiana 70139

STIPULATION

It is hereby stipulated by and among counsel for plaintiff and counsel for defense that the deposition of

SONYA STIRGUS

be taken before Cynthia M. Hare, Certified Court Reporter, by counsel for the defendant, for all purposes, pursuant the appropriate statutes of the Federal Rules of Civil Procedure.

The parties hereto waive all formalities in connection with the taking of said deposition, except the reading and signing thereof, the swearing of the witness and the reduction of the questions and answers to typewriting.

Counsel for all parties reserve all objections, except as to the form of the question and responsiveness of the answer, at the time of taking said deposition, but they also reserve the right to make objections at the time said deposition or any part thereof may be offered in evidence, with the same rights as if the testimony had been taken and given in Open Court.

*   *   *

4

INDEX


EXAMINATION BY MR. CAMELFORD. . . . . . . . . . . . . 5


OBJECTIONS:

BY MR. MURA . . . . . . . . . . . . . . . . . . . .70


EXHIBITS:

EXHIBIT 1 - Copy of Driver's License. . . . . . .36

EXHIBIT 2 - Photograph. . . . . . . . . . . . . .36

EXHIBIT 3 - Photograph. . . . . . . . . . . . . .36

EXHIBIT 4 - Photograph. . . . . . . . . . . . . .36

SONYA STIRGUS,

after having been duly sworn, was examined and did

testify as follows:

EXAMINATION BY MR. CAMELFORD:

Q    Good afternoon.  How do you say your last name?

A    Stirgus.

Q    Okay, that's what I thought.  I just wanted to
get it right.  Good afternoon, Ms. Stirgus, my
name is Jason Camelford.  I'm here, I represent
Dillard's in this litigation.  And we're here
to talk about your accident that occurred at
Dillard's on October 21, 2016, okay?

A    Uh-huh.

Q    Have you ever given a deposition before?

A    No.

Q    Just some ground rules just to make it easier
for us.  I'm sure you talked to your attorney
beforehand and he probably told you a bunch of
the same stuff I'm about to say.  But over
here, our court reporter, Ms. Cindy, is taking
down everything that you, me, and your attorney
say today.  And then what she's going to do
afterwards, she's going to produce a little
book, you know, with just everything that we
say.  It will go, you know, my question and

then followed by your answer.  So to that end, it's really important we don't speak at the same time.  We're going to try to make her life as easy as possible.  So if you could, even if you know the answer to my question the minute I start asking it, just let me finish asking it before you answer so that we can get a clear record, okay?

A    Okay.

Q    I'll give you the same courtesy, all right?

A    Okay.

Q    The other important thing, because it doesn't show up well on paper, is saying "uh-huh," "unh-unh," nodding and shaking your head, because that won't show up good later, all right.  So can't have that happening.  If you forget any of these things, don't worry about it, either I'll remind you, Ms. Cindy will remind you, or your attorney will remind you, okay?  I can tell you're kind of soft spoken, so if -- I may ask you just to speak up a little bit so that we can all hear you and we get a clean record, same thing, okay?

A    Okay.

Q    If you need  break for any reason, as your

attorney told me before the deposition, you're pregnant, if you need a couple of minutes, just let me know. Say, "Jason, I need a -- can we take a quick break?" As long as you just finish answering whatever question we're talking about, that will be no problem, okay?

A   Okay.

Q   So just let me know. I hope not to keep you here too long today. I understand you have kids out here, as well.

A   Uh-huh.

Q   So we'll try to get you out of here as quick as we can, okay?

A   Okay.

Q   What we're going to do is we're going to talk about your background, your education, your employment, and what happened at Dillard's, and then the medical treatment you've undergone since, okay?

A   Okay.

Q   And I'll try to get through that as quick as I can. Did you look at any documents, or review anything to prepare for the deposition today?

A   No.

Q   I want to understand, just to make sure at the

outset, that I have a clear list of everything we're here to talk about today.  What happened at the beginning of this case is I sent your attorney a bunch of written questions.  And he wrote me back with a bunch of answers to those written questions.  One of those things was, what injuries are you telling me that you sustained when this happened, okay?

A     Uh-huh.

Q     And what you wrote -- what your attorney wrote was that you've got -- you had some headaches, some dizziness, blurry vision, and some neck pain.  Is there any other injuries you sustained from the mannequin that you're claiming as part of this accident?

A     Yes.

Q     Tell me what else.

A     A concussion, I've been having tingling in my right hand and up to the right arm towards my elbow, and pain in my spine.

Q     And you're pointing to your shoulder or your neck area?

A     Yeah.

Q     You mean your neck?

A     Yeah.

Q    Okay, because you spine could mean all the way down to your behind, right?

A    Right.

Q    So you're not telling me you have low back pain as a result of this accident, are you?

A    No, just right here (indicating), like around the neck.

Q    And whenever you point to anything, because that doesn't show up well in the transcript later, I may ask you just to clarify.  So what you're saying is really at the base of your neck by your shoulders?

A    Uh-huh.

Q    Yeah?

A    Yes.

Q    I understand, however, that you are not making a claim for lost wages; is that correct?

A    Yes.

Q    Is that because you didn't miss any time at work?

A    No, I didn't.

Q    All right.  In your responses to the people you might call at trial, you listed your two children, Jaden and Brianna.  I understand they were with you at the time of the accident?

A    Yes.

Q    But it says here that they will not be called
     to testify; is that correct?  You don't intend
     to have them come?

A    No.

Q    I have your current address at 403 20th Street;
     is that still the right address?

A    Yes.

Q    How long have you been there?

A    For a year.

Q    Do you rent or own?

A    Rent.

Q    Who lives at that place?

A    Just me and my two kids.

Q    Okay, where were you living before that?

A    In Algiers, on Behrman Avenue, 1418 Behrman
     Avenue, Apartment 1, and that's in New Orleans,
     Louisiana.

Q    Who was living there?

A    The same people.

Q    Renting, or owning?

A    Renting.

Q    How long did you live at that Behrman Avenue
     address?

A    For seven years.

Q    So last year was 2017, so if I said you were at
     that Behrman Avenue address for 2010 through
     2017; does that sound about right?

A    Yeah, uh-huh.

Q    Before that where were you living?

A    With my mom.

Q    What's her address?

A    2017 Ptolemy Street, P-T-O-L-E-M-Y, Street, and
     that's in New Orleans, Louisiana, as well.

Q    Is that a house your mom owns?

A    Yes.

Q    I've got your date of birth as February 25,
     '84; is that right?

A    Yes.

Q    What made you move out of your mom's house?

A    I had kids.

Q    That's a completely reasonable answer.  Where
     were you born, in New Orleans?

A    Yes.

Q    You lived here your whole life?

A    Yes.

Q    What did you do for Katrina, did you evacuate
     for Katrina?

A    Yes, I did.

Q    Where did you go?

A   To Shreveport.

Q   Have you ever lived in any other states; --

A   No.

Q   -- Texas, Mississippi, anywhere else?

A   No.

Q   Do you have your driver's license with you?

A   Yes.

Q   Do you want to pull it out for me.  I'm just
going to get somebody to make a copy of it
whenever we take a break, okay?

A   Okay.

Q   I'm just going to leave it right here so we
don't forget and so I make sure you get it
back, okay?  The last thing I want to see
happen is you end up leaving here without that
thing.  So I'll just leave it right there and
make sure you get it back today.  Are you
married?

A   No.

Q   Have you ever been married?

A   No.

Q   I asked you earlier about your two kids,
Brianna and Jaden, those are the only two kids
you have?

A   Yes.

**13**

Q    What's Brianna's date of birth?

A    August 13, 2009.

Q    And Jaden's?

A    July 31, 2006.

Q    Do they both have the same father?

A    No.

Q    Who's Brianna's father?

A    Brannon Coleman.

Q    B-R-E-N-N-A-N?

A    B-R-A-N-N-O-N, Coleman, C-O-L-E-M-A-N.

Q    And Jaden?

A    Jaden, his father is absent.

Q    You don't know him?

A    Yeah, I know him.  His name is Karliko McGhee,
it's K-A-R-L-I-K-O, McGhee, M-C-G-H-E-E.

Q    And when you say "he's absent," that means you
don't know where he's at?

A    Correct.

Q    You know Mr. Coleman's current address?

A    No, not his actual address, no.

Q    You know how to get in touch with him if you
needed to, though?

A    Yes.

Q    What, do you have a phone number for him?

A    Yes.

Q   When was the last time you talked to him?

A   Today.

Q   Why did you talk to him today?

A   Just to talk with his daughter.

Q   Okay, have you discussed this accident with him?

A   No.

Q   So it would be fair to say you've never spoken to Mr. Coleman about this accident?

A   Correct.

Q   Do you have his number handy?

A   In my cell phone.

Q   Do you have your phone with you?

A   Out there.

Q   That's okay, I'll get it from your attorney later.  You said nobody else lives with you but you and your two kids for the last seven years; is that right?

A   Correct.

Q   Tell me about your education.  Did you graduate high school?

A   Yes.

Q   Where did you go to school?

A   Edna Carr.

Q   And I apologize I got to take all these notes.

I promise I'm listening, but I got to put something together before I get the transcript, so if you see me writing, just feel free to keep talking, okay?  I promise I'm listening.

A   Okay.

Q   What year did you graduate from Edna?

A   2002.

Q   After you graduated high school, did you go on to any post secondary education?

A   Yes, to Delgado.

Q   What did you study at Delgado?

A   Business management.

Q   Did you graduate?

A   No.

Q   How long did you go to Delgado?

A   It must have been a year and a half, up until Hurricane Katrina.

Q   Okay.  Is that why you ended up not finishing?

A   Correct.

Q   What did you do when you went up to Shreveport?

A   I continued working.

Q   Where?

A   At a restaurant, Taco Bell.

Q   Why Shreveport, of all places?

A   When my mom, she works for the VA hospital.  We

were with her at the VA, and when they came to pick us up, that's pretty much, they gave us three options, Jackson, Shreveport, and I forgot the other place. And we chose Shreveport.

Q    You don't have any family or anything up there, that's not why y'all went?

A    No, unh-unh.

Q    How long did you stay in Shreveport?

A    Probably three months. The hurricane happened in August. We came back October, me and my brother.

Q    And when you came back, did y'all stay at your mom's place for a little while?

A    No.

Q    Where did y'all stay?

A    We stayed in an apartment.

Q    What apartment?

A    Jackson Landing.

Q    Did you live there for the five years from Katrina until you moved into the Behrman Avenue address?

A    No.

Q    Tell me that address that you came back to.

A    Which one?

Q    The one right after Katrina, when you came back?

A    I don't remember the address.

Q    Where was it, generally?

A    It was off of General DeGaulle; that's numerous of apartments there.

Q    How long did you stay there?

A    It must have been like two years.

Q    Who lived with you there?

A    My brother, Jeff Stirgus.

Q    And then where did you live after that?

A    With my mom.

Q    Why didn't you go back to your mom's place? Was it messed up as a result of Katrina?

A    The apartment complex?

Q    Yeah.

A    I believe there was an eviction.  We went to Mississippi to see my mom.  We gave the manager the rent, and she put the rent back in the drawer, for whatever strange reason.

Q    Okay, weird, right?

A    Yeah.

Q    All right.  Other than the year and a half that you studied at Delgado, do you have any other post secondary education?

18

A    I'm in nursing school at the moment.

Q    Where?

A    At Healthcare Institute.

Q    What's Healthcare Institute?

A    It's just like a school for like, CNA,
phlebotomy.

Q    Is it local, or online?

A    Local.

Q    Where's it at?

A    In Kenner, Louisiana.

Q    How long you been studying there?

A    I started in May.

Q    So you're just about two months in?

A    Yeah.  And then I went on a leave because of my
pregnancy.

Q    What are you trying to study there?

A    PN, practical nursing.

Q    What's the degree you would receive?

A    Associate's.

Q    Associate's degree in nursing?

A    Yeah.

Q    It said in your discovery responses that you
were managing a Burger King when this accident
occurred; do I have that right?

A    Yes, that's correct.

Q    When did you last work there?

A    March 30, 2018.

Q    And you were the manager?

A    Uh-huh.

Q    You said March 13th of this year?

A    30th.

Q    Oh, March 30th?

A    Uh-huh.

Q    And why did you leave?

A    I was terminated.

Q    Why were you terminated?

A    It was due to they claim I broke a policy.  I was shutting down drive-thru.

Q    So you were shutting down what?  Oh, you were shutting down drive-thru?

A    They claim that I shut down the drive-thru.

Q    And what did you do wrong?

A    That's what they claim I did wrong, that I shut the drive-thru down before it was supposed to close.

Q    Oh, like it was supposed to close at 2:00 and you shut it down at 1:00?

A    Yeah.

Q    Was it true?

A    No.

20

Q    Did you fight the termination?

A    Uh-huh.

Q    What happened?

A    I'm still in the process of fighting it.

Q    Do you have a lawyer in that case?

A    No.

Q    What's going on with that now?

A    I went through the Board of Reviews.  The next step is to go to the District Court and file another -- what's the word for it -- another claim.

Q    What District Court would you go to for that?

A    Gretna, Louisiana.

Q    And do you plan to go forward with that?

A    Uh-huh.

Q    So yes?

A    Yes, I'm sorry.

Q    That's okay.  Is that the 24th, the big courthouse in Jefferson Parish, or is it a different courthouse?

A    I don't know.

Q    Where was that Burger King?

A    In Algiers, Louisiana.

Q    Okay, so it was in --

A    New Orleans, Louisiana.

Q    -- Orleans Parish?

A    Uh-huh.

Q    What's the address?

A    I don't know the actual address.

Q    But do you know what street it's on?

A    General DeGaulle.

Q    Do you know if there's more than one Burger King over there?

A    Just one.

Q    Is it the one over by Holiday Drive and MacArthur Boulevard and all that?

A    Yes.

Q    So if I said 4230 General Degaulle, does that sound about right, or you don't even know?

A    I don't know.

Q    That's fine, don't worry about it.  How long did you work at that Burger King for?

A    I have been with the company for about eight years.

Q    All at the same location?

A    No.

Q    What other locations did you work at?

A    The Harvey location, the Marrero location, the Westwego location.

Q    Why did you move through so many different

22

stores?

A    When you're in management, they never really keep you in one spot.  It depends on what they need.

Q    Okay.  All those locations, do you know if they're owned by Burger King directly, or somebody local who owns a bunch of franchises?

A    Someone that owns franchises.  They're not local.

Q    Do you know the name of the franchiser company?

A    Yeah, for seven years of my career, was Strategic Restaurants.

Q    Okay.

A    And the last year and a half, before I left, it was GPS Hospitality.

Q    Why the change, do you know?

A    I believe the owner of Strategic was ready to retire.

Q    So they kind of sold all their assets to the other guy?

A    Yeah.

Q    Okay, so first seven was Strategic Resources (sic), and then last was, what?

A    Strategic Restaurants.

Q    Right, oh, did I say something different?

A    Resources.

Q    I'm sorry, I can't even look at my own handwriting.  Strategic Restaurants, and then the last one?

A    GPS Hospitality.

Q    During the other seven -- during the eight years prior to your termination from Burger King, did you have any problems or complaints?

A    No.

Q    Did you increase in role while you're doing it, start as assistant manager, or start as someone on the line and move up?

A    Yes.

Q    Where did you start?

A    I got on as an assistant manager.

Q    Okay.

A    And maybe like four years from there I became a general manager.

Q    Okay.

A    And then I took another -- I stepped down and became an assistant again.

Q    Why?

A    Because it was just getting to be too rough.

Q    Too much hours?

A    Uh-huh.

**24**

Q    Because of the kids?

A    Yeah.

Q    But when you were terminated, were you a manager at that point, or were you an assistant?

A    I was a shift manager with the company.

Q    Let me understand what the difference between all those things is.

A    The difference is the assistant manager takes over once the GM goes out on vacation when they're off; the shift managers pretty much just run the shift.

Q    Okay, they're just -- you're in and out and running what occurs during that period of time?

A    Right.

Q    Open and close responsibilities, as well?

A    Correct.

Q    So are you responsible for the till, as well?

A    Correct.

Q    In terms of that termination, was there any allegations that you had stolen any money?

A    No.

Q    So no allegations of theft or anything, they just said, you closed this wrong, we're letting you go?

**25**

A    Right.

Q    How much were you making an hour when you were terminated?

A    Fourteen Dollars and Twenty-Six Cents ($14.26).

Q    Is that the same amount you were making when this accident occurred in October of '16.

A    I believe it may have been Fourteen Sixteen per hour.

Q    Okay, so about the same?

A    Yeah.

Q    After this accident occurred, were you able to keep working doing the job as you had been doing it all the time you lived there -- or worked there at Burger King beforehand?

A    Yes.

Q    So in other words, any injuries you might have sustained didn't prevent you from doing any work?

A    No.

Q    You've ever been a member of the military?

A    No.

Q    Have you ever been arrested?

A    Yes.

Q    When were you arrested?

A    2011.

**26**

Q    What for?

A    Traffic ticket.

Q    What was the traffic ticket for?

A    It was numerous of traffic tickets in Gretna --
unpaid traffic tickets.

Q    What happened with that?

A    It was cleared up.

Q    You paid your fines?

A    Yeah.

Q    Other than that arrest in 2011, have you ever
been otherwise arrested?

A    No.

Q    Have you ever filed a lawsuit before?

A    No.

Q    What about workers' compensation claim?

A    No.

Q    Social Security disability?

A    No.

Q    Other than -- well, when you were working, did
you have any -- when this accident occurred,
did you have any sources of income, other than
your Burger King job?

A    No.

Q    What sources of income do you have now, if any?

A    None.

Q   How are you paying bills?

A   With help from family members.

Q   Are you going to stay in your current address?

A   Yes.

Q   So either from savings or the family members, y'all are able to make rent?

A   Yes.

Q   Congratulations on the twins.  After you have four of them running around, you're still going to be in the same apartment?

A   Yes.

Q   Are you relying on your mom to help you out?

A   Until I go back to work, yes.

Q   And what's your intention after the kids; are you going back to school, --

A   Yes.

Q   -- going back to work?

A   Yes.

Q   Which, do you know?  Which, school, work, what's the plan?

A   Both.

Q   How are you going to manage all that; where are you going to work, and what school are you going to do?

A   I'm not sure where I'm going to work.  I will

find a job.

Q    Retail, or fast food, or other plans?

A    Other plans.

Q    Like what?

A    Maybe doing sitting work.

Q    Okay.  But in other words undecided; is that fair to say?

A    Yes.

Q    And then you're planning to go back to school, too?

A    Yes.

Q    And for the same nursing program that we're talking about?

A    Uh-huh.

Q    So yes?

A    Yes.

Q    Do you have a time line for any of those things when you're going to do them?

A    Within six weeks after I have the baby.

Q    Babies, right?

A    Babies.

Q    When are you due?

A    July 3rd.

Q    Oh, wow.  I have an eight month old so I kind of get it.  Let's talk about what actually

happened at Dillard's, okay?  It says in your discovery responses is you shop at that Dillard's store three times a month; is that about right?

A   Yes.

Q   And what do you normally shop for when you go there?

A   Perfume and accessories.

Q   Now, the perfume area of that store is in a little bit of a different spot than where this accident occurred, right?

A   Uh-huh.

Q   Yes?

A   Yes.

Q   In the area where this accident occurred, that lingerie section, had you shopped in that section before?

A   Yes.

Q   Okay, so you were familiar with that section?

A   Yes.

Q   How often would you shop in that section?

A   Only if I needed something for an event.

Q   So if you go in there three times a month, which, you know, let's say three times a month, 12 times -- 12 months of the year, somewhere

30

around 35 to 40 times a year, right?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    How many of those 35 to 40 times a year would you be in the lingerie section?

A    Probably twice.

Q    Okay, so two or three times a year, somewhere in there?

A    (Nods head up and down)

Q    So yes?

A    Yes.

Q    Had the layout of that section changed in the year prior to when the mannequin fell on you?

A    I didn't notice.

Q    To the best of your knowledge, was it the same?

A    Yes.

Q    Had you shopped near where the mannequin fell before?

A    No.

Q    Had you noticed those mannequins in the store before?

A    No.

Q    Do you know when the mannequin got put up?

A    No.

Q   So it could have been there for years, it could have been there for a week, you have no idea?

A   Correct.

Q   Have you ever heard of one of those mannequins falling on a customer at any other time?

A   No.

Q   All right, now, I already know the answer to this question but tell me why you were at Dillard's that day.

A   My sister had a wedding the next day.

Q   And your sister's name is?

A   Brittany Stirgus -- well, Brittany Butler now.

Q   At the time, though, it was Brittany --

A   Brittany Stirgus.

Q   And I understand it was the next day, right?

A   Correct.

Q   What's Brittany's address?

A   I don't know.

Q   Do you know where she's living?

A   Yeah, I know where she lives.

Q   Where at?

A   In Metairie, Louisiana.

Q   Are y'all still on good terms?

A   Yes.

Q   Did you go to the wedding?

A     Yes.

Q     Do you have any photos?

A     Yes.

Q     All right, so tell me what you did that day before you ended up going to Dillard's.

A     The day before?

Q     No, no, because this accident happened in the evening time, right?

A     Uh-huh.

Q     Yes?  Around eight o'clock I understand, right?

A     Yes.

Q     So tell me everything you did in the, you know, day before Dillard's, before you came over.

A     I'm not sure.

Q     In your response to interrogatory number 17 where I said, "Tell me everything you did in the 12 hours before October 21, 2016."  It says, to the best of your recollection, earlier in the day you dropped the kids off at school at William Fisher Elementary School; is that right?

A     Yes.

Q     And then it said, afterwards you went to a hairdresser on Elysian Fields to have your hair done and prep for your sister's wedding the

following day; is that right?

A    Yeah, that's right.

Q    And then it says, you picked the kids up and ate dinner with them; is that right?

A    Yes.

Q    Before picking the kids up and eating dinner, other than dropping the kids off at school and going to get your hair done, did you do anything else?

A    No.

Q    How long were you at the hair location?

A    About two hours.

Q    What did you do other than the hair location then?

A    Just drove in my car to go pick up the kids, that's it.

Q    You would agree with me, the kids are probably at school for longer than two hours, right?

A    Correct.

Q    So did you go home, hang out at the house, what else did you do?

A    Yes, most likely so.

Q    You're just not sure?

A    Correct.

Q    And then it says you picked the kids up from

34

school and at dinner with them.  Does that mean you picked them up and went home and ate dinner?

A   Yes.

Q   And then you went to Dillard's?

A   Yes.

Q   And it says you walked right into the Dillard's store without going to any other stores before the accident; is that right?

A   Correct.

Q   So is there anything else you recall doing that day?

A   No.

Q   Did you consume any alcohol?

A   No.

Q   Any illegal drugs?

A   No.

Q   Were you on any prescription medication when this accident occurred?

A   No.

Q   All right, so how long had you been at Dillard's before the mannequin fell?

A   I don't know.

Q   Minutes, hours?

A   It had to be minutes.

35

Q    Why do you say "had to be"?

A    Because I knew what I was there for, and it was just to get a girdle to go underneath the garment that I was wearing at the wedding.

Q    Okay.  Do you know what entry you came into the store, what department?

A    Right there by the lingerie.

Q    It's also the shoe department that's right there, too, --

A    Yeah, right across.

Q    -- and there's the doors right there.  You came in those doors?

A    Uh-huh.

Q    And then you made a beeline right for that lingerie area; is that right?

A    Yes.

Q    How long were you looking and shopping before the mannequin fell?

A    Maybe ten minutes.

Q    Just looking at merchandise?

A    Yes.

Q    All right, so tell me what happens.  You're looking at the merchandise, and then what happens next?

A    I'm looking at the merchandise that had to be

underneath the shelf.  I'm just hitting the tags, like looking for my size, and then something just hits me across the head.

Q    Did you know the mannequin was there while you were looking for stuff?

A    I didn't pay attention.

Q    So you have no idea if it was there before or not; --

A    No.

Q    -- is that fair?

A    Uh-huh.

Q    I have a couple of pictures here that I disclosed to your attorney beforehand.  These are pictures that were provided to me by Dillard's that purport to be at the location where you accident occurred.

           MR. CAMELFORD:

                This one here, which I'll mark as Exhibit -- well, I'll mark here a copy of your license -- this is for the court reporter -- as Exhibit 1.  And then I'll mark these three pictures individually as 2 (Exhibit 2), 3 (Exhibit 3), and 4 (Exhibit 4).

MR. CAMELFORD:

Q    And this one here, the first one, it's got a "TC" on it and there's a little shelf in front of it.  Does that fairly and accurately represent where the mannequin was before it fell?

A    Yes.

Q    What picture here in number 2 is, it depicts a mannequin in a black, I don't know, some negligee, something; is that a fair and accurate depiction of the mannequin that fell on you?

A    Yes.

            MR. MURA:

                Or something, huh?

            MR. CAMELFORD:

                I'm not really sure what that is.

            THE WITNESS:

                It's a girdle.

MR. CAMELFORD:

Q    This third one here, it's similar to the first one, but does that fairly and accurately depict the shopping area where the mannequin fell?

A    Yes.

            MR. CAMELFORD:

                And Cindy, I'll email this to you as

soon as we're done here.

MR. CAMELFORD:

Q    Did you pick up the mannequin afterwards?

A    No.

Q    Do you have any idea how much it might have weighed?

A    Judging from it hitting my head, I would say at least a good, maybe 30 pounds.

Q    But you never picked it up afterwards?

A    No.

Q    So 30 pounds, that's just a guess, right?

A    Yes.

Q    Have you ever had anything fall on your head before?

A    No.

Q    So you don't really have any frame of reference for what the weight of something might be when it falls; is that fair to say?

A    Yeah.

Q    You had your kids there with you, right?

A    Yes.

Q    What were they doing in the moments before this occurred?

A    Just standing there.

Q    They weren't running around playing games or

anything like that?

A    No.

Q    They were just standing right by you?

A    Yes.

Q    And I think I asked you this already, but the incident report says the incident happened at about 8:05; does that sound about right to you?

A    Yes.

Q    All right, so do you know if any part of your body struck any part of that shelf prior to the mannequin falling?

A    No.

Q    No, you don't know; or no, it did not?

A    It did not.

Q    Do you know if any of your kids touched the shelf prior to the mannequin falling?

A    No, they didn't.

Q    Do you know if any of the merchandise you were looking for touched or struck the shelf?

A    No, it didn't.

Q    Did you have any idea why the mannequin fell?

A    No.

Q    During the ten minutes while you were -- during those ten minutes you were shopping -- you told me a couple of minutes ago you shopped for ten

minutes -- were you in the general area within, you know, five or ten feet around from this display that we're talking about?

A   Yes.

Q   During those ten or so minutes, did the mannequin fall or shift at any point during this time?

A   No.

Q   While you were in that area, did you notice any of the other mannequins that were right by there?

A   No.

Q   If I told you there were a whole bunch of mannequins just like that one in that area, you wouldn't have any reason to disagree with me, right?

A   Yeah.

Q   You would have a reason to disagree?

A   I didn't see any.

Q   You didn't see them, but --

A   Right.

Q   -- if they -- you know, if they're there on the video and they're there in the store, you wouldn't disagree with the video, right?

A   No.

Q   So to sum up the last couple of minutes, you don't think you or your kids did anything to make the mannequin fall, but you have no idea why it fell?

A   Correct.

Q   Where did the mannequin strike you?

A   It hit me directly in the middle of my head and just rolled down my back.

Q   Do you have any idea what part of the mannequin struck you?

A   No.

Q   What happened immediately after that?

A   One of the associates, she came maybe like one minute later, and I can hear her picking up the mannequin.

Q   What did you do?

A   I was just holding my face, crying.

Q   Were you sitting on the floor, were you standing?

A   I was standing.

Q   So from the moment the mannequin hits you, you were standing -- where were you standing?

A   I was standing -- when the mannequin actually hit me, --

Q   Yeah.

A    -- I was bent over looking at the merchandise underneath the mannequin.

Q    Okay, would that be the pink and black merchandise that's under there?

A    No, right here (indicating).

Q    The -- the --

A    The girdle.

Q    -- the girdle, okay, that's the one that on these two kind of beige items, that's the higher one just underneath the shelf, right?

A    Correct.

Q    And immediately before it fell, you were looking at that product?

A    Yes, I was just looking at the tag.

Q    Okay, and so you were bent over.  So you couldn't see what was happening with the mannequin above you; is that fair?

A    Correct.

Q    And then did the mannequin, after it fell, did it fall kind of towards the outside of that picture, meaning it fell behind where you would have been?

A    No, it fell directly on my head.

Q    Yeah, but after it struck you, where did it go?

A    Yeah, behind me.

Q   And then did you see how it came to a rest on
    the floor; was it standing up, lying down?

A   Lying down.

Q   And then some short time later an associate
    came over?

A   Yeah.

Q   And what happened when that associate came
    over?

A   I just heard her saying, "Oh, my God," and she
    grabbed the mannequin.

Q   She said, "Oh, my God"?

A   Yeah.

Q   Do you know what she meant?

A   I guess she as just in disbelief that it hit me
    across the head.  And she asked me if, you
    know, I wanted to sit down, and asked did I
    want, you know, the manager and just, you know,
    being courteous.

Q   Yeah.  What happened, what did you say?

A   I told her yes.

Q   I guess there were two questions there.  She
    offered to have you sit down and the manager.
    Did you say yes to both of those things?

A   To the manager.

Q   Okay, you didn't need to sit down or anything,

though?

A    No.

Q    You said you were crying when she came over.
     How long did you cry for?

A    Just a couple of minutes.  Just from the pain,
     that's all.

Q    What hurt at that point?

A    I was dizzy, and I had a very horrible
     headache.

Q    Immediately?

A    Yes.

Q    Anything else bothering you at that moment?

A    No.

Q    So what happened after she offered to have the
     manager come?

A    He came.  It was maybe like two or three
     minutes, he came immediately, and he wrote the
     report.

Q    Do you remember his name?

A    No.

Q    Describe the first associate who came over to
     come see you.

A    She was an African American female, probably my
     shoulder height.

Q    How tall are you?

A    I'm about five-eight.

Q    So she would be about five-five, then?

A    Yeah.

Q    And describe the manager.

A    The manager, he was a Caucasian male.

Q    Yeah?

A    Uh-huh.

Q    Also about the same height?

A    Probably about my height.

Q    Did you catch either of their names?

A    No.

Q    If I said that I think the name of the store associate who came to see you was Kiera Landry (phonetic); does that ring any bells?

A    I don't know her name.

Q    What about the manager, did you ever catch his name?

A    No.

Q    If I said his name would you know it?

A    No.

Q    All right, when the manager came, tell me what happened.

A    He wrote the incident report.  I signed off on it, and that was it.  Once I signed off on it, I went and purchased the item, and then I went

home.

Q    How long after the manager came over did you
     end up going to buy the item?

A    It may have been like two/three minutes.  It
     wasn't long at all.

Q    I have what -- this is a customer incident
     report.  Do you recognize that?

A    Yeah.

Q    Is this what you said you signed off on?

A    Uh-huh.

Q    And when you said -- I'm sorry, you mean yes?

A    Yes.

Q    When you say you "signed off on it," what does
     that mean?  I don't see your signature on here
     anywhere.

A    Oh, okay.

Q    You just meant you talked to him, you reviewed
     it and this is accurate?

A    Correct.

Q    All right, so after --

          MR. MURA:

               Can I ask her a question while we're on
          it?

          MR. CAMELFORD:

               Sure.

MR. MURA:

    Is that your handwriting on there?

THE WITNESS:

    No.

MR. MURA:

    None of this is your handwriting?

THE WITNESS:

    No.

MR. MURA:

    Thank you.  I'm sorry, Jason.

MR. CAMELFORD:

    No, no, no, that's okay.  I'm just going to ask another question to follow-up on that, then.

MR. CAMELFORD:

Q    I think I already asked this, but even though you didn't write this, you said you signed off on it, correct?

A    Yes, I looked at it.

Q    In other words, it's a fair and accurate representation of what you told the guy to write down, right?

A    Correct.

Q    So after Dillard's, and after you finished purchasing the girdle, what did you do next?

A    I went home.

Q    Was anybody else there, or just you and your kids?

A    Just me and my kids.

Q    Why didn't you go to the doctor?

A    At the moment, I didn't feel the extra pain that I thought I would feel within a day or two.

Q    What do you mean by that?  You said you had a headache and you were dizzy, why didn't you go to the doctor?

A    I just didn't feel I needed to go to the doctor at the moment.

Q    Now, you told me at some point later you learned you had a concussion, right?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    So wouldn't you agree with me that you probably should have gone to the doctor right away to take care of your potential injury?

A    Yes, I should have.

Q    If I understand correctly, you didn't go to any doctor until the 27th, which is about six days later when you went to Algiers Urgent Care;

does that sound about right?

A    That Wednesday.

Q    That Wednesday?

A    Uh-huh.

Q    Okay, I don't -- let's look on the calender.
That's what you recall, you first went to a
doctor on a Wednesday?

A    Yeah, I went to Urgent Care on a Wednesday.

Q    What makes you think it was a Wednesday?

A    Because I remember it being a Wednesday.

Q    What day was your sister's wedding on?

A    It was that Saturday.

Q    So this happened on Friday night?

A    Yes.

Q    Okay.  All right, so between the 21st, that
Friday night, and the 27th, that following
Wednesday, why didn't you go to a doctor for
any of those six days -- five days?

A    I just felt a little sore.  Come around that
Tuesday, that's when I started feeling a lot of
the pain from the actual incident.

Q    Tell me about your sister's wedding.  Where was
it?

A    It was at the church -- the Upper Room
Cathedral on the Westbank Expressway.

50

Q    Tell me again which church.

A    Upper Room Cathedral on the Westbank
Expressway.

Q    You had a reception afterwards?

A    Yes.

Q    Where was that?

A    The reception was at -- I'm trying to think of
the place name -- I know exactly where it's at,
I just can't think of the name.

Q    Tell me generally where it's at.

A    It's in Harahan, Louisiana, right behind the
Clearview outlet -- Magnolia Plantation.

Q    Did you have fun at the wedding?

A    Yes, I did.

Q    Did any of the injuries or anything from
Dillard's prevent you from enjoying the
wedding.

A    Maybe from dancing and moving around so
quickly.

Q    I'm sorry, I didn't mean to interrupt you.
Were you still dancing and moving around at the
wedding?

A    No, unh-unh.

Q    Why not, what was bothering you, specifically?

A    When I would turn my neck, if I moved around

too fast, I would get dizzy.

Q   So that's the following day.  On the Sunday, if you were having dizziness spells when you were at the wedding, why didn't you go to the doctor that day?

A   I just didn't go.

Q   When you finally did go, did you talk to anyone, or did anyone tell you that you should go to a doctor?

A   Yes.

Q   Who was that?

A   My mom.

Q   What did she say?

A   She just was like, "It seems like it's really bothering you."

Q   When did she tell you that?

A   That had to be that Monday.

Q   And you still didn't go Tuesday, then?

A   No.

Q   Why not?

A   I just was taking Tylenol or whatever I could take to just kind of suppress the pain.

Q   All right, so between those five days or six days, the 21st to the 27th, tell me everything that you couldn't do as a result of the pain

from the mannequin incident.

A    I couldn't bend down as much as I wanted to, that I was normally used to doing.  I couldn't turn my head like I normally do.  And when I would lay down and sleep, I had to position myself a certain way to kind of suppress the pain in my neck.

Q    Where was the -- I'm sorry, that answers the question.

A    Yeah.

Q    Was it only your neck that had pain?

A    My head, my neck.

Q    Anything else?

A    And my upper back.

Q    When the mannequin fell on your head, you didn't lose consciousness, correct?

A    No.

Q    I asked you to say correct, so is it true you didn't lose consciousness?

A    Correct.

Q    During those same period of time, that Monday and Tuesday -- well, actually, during that whole period of time, the 21st through the 27th, were you working?

A    No.

53

Q   Why not?

A   I was on vacation.

Q   Okay, so how long was that vacation?

A   The vacation started that Thursday -- it was
from Thursday to Thursday.

Q   And was that just because of the wedding?

A   Yes.

Q   When did you first go back, that Thursday, or
Friday?

A   That Thursday.

Q   Did you have any problems doing your work
because of the injuries from Dillard's?

A   Yes.

Q   Tell me about that.

A   Just moving.  We look at monitors to view
orders.  It would be blurry, just a little bit.
And if I would turn my neck, like I said,
again, I'm used to moving real fast, I couldn't
turn my neck as fast.

Q   Did you ever have any slip and falls at any
point in your life prior to this accident at
Dillard's?

A   No.

Q   You ever hurt your back or your neck at any
point?

A    No.

Q    There's a note in the medical record that says you were specifically requesting documentation to support any future legal action -- this is from Urgent Care -- that may arise.  Had you intended to already file a lawsuit by that point?

A    No.

Q    So what did -- I mean, I'll pull up the record if you want, but what does that mean, generally; do you know?

A    Just in case I had to go to therapy and I needed bills paid, I didn't want to pay it out of my pocket.

Q    So at that point you had thought well maybe I may need some compensation?

A    No, that I may need therapy.

Q    Okay, therapy, and then -- but you wanted to make sure that someone else was paying for the therapy, right?

A    Yeah.

Q    When you started treating at Advanced Medical, which is where you went about two weeks later on the 11th; does that sound right?

A    Yeah.

Q    November 11th?  Who told you to go there?

A    Who told me to go to Advanced Medical?

Q    Uh-huh.

A    The attorney recommended.

Q    Is that here at Chip Forstall's office?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    When did you first see an attorney?

A    It had to be maybe a week later.

Q    A week after that first treatment, or a week after the incident?

A    A week after the incident.

Q    Why did you go see an attorney at that point?

A    Why did I go see an attorney for --

Q    Why did you go see an attorney at that point?

A    To make sure someone would pay for the medical bill.

Q    Had you ever been to Advanced Medical Center at any point before?

A    No.

Q    Mr. Forstall's office told you to go there?

A    No.

Q    Before this incident, did you have a primary care physician?

A    No.

Q    Were you getting any treatment at all?

A    No.

Q    If you had to go to a doctor because you needed stitches for your finger or whatnot, what would you do?

A    Go to the ER.

Q    What about an OB-GYN?

A    Yeah, I had an OB-GYN.

Q    Who is it?

A    It was a clinic on Lapalco Boulevard.  That's the clinic that's West Jeff.

Q    Okay.  In, let's say the two years before this incident occurred, had you gone for any medical treatment whatsoever?

A    For injuries, no.

Q    What about any medical treatment whatsoever?

A    Yes.

Q    And what treatment was that for?

A    Anything dealing with the feminine body.

Q    And that was just to this clinic?

A    To see the OB-GYN.

Q    Had you ever seen any doctors at any time prior to our injury in October of '16, for other injuries?

A    No.

Q    I do have a note from October -- from February of 2016, so about eight months before, you had gone to the same Algiers Urgent Care for low back pain.  Do you know what that was for?

A    A UTI.

Q    And you went to the Algiers Urgent Care for that?

A    Uh-huh.

Q    Had you been to any other Urgent Care facilities in the five years prior to our incident?

A    I don't know.

Q    By the time you first went to Advanced Medical Center, were you still experiencing headaches and dizziness?

A    Yes.

Q    So that's about 20 days thereabout -- 21 days. Over those three weeks, had the headaches or dizziness improved, gotten worse, stayed the same since the incident?

A    They pretty much stayed the same.

Q    Do you still have the same level of headaches and dizziness?

A    They went down a little bit.

Q   So that first time you went to Advanced Medical
    Center regarding the headaches and dizziness,
    on a scale from one to ten, with one being
    really not bad at all and ten being so bad that
    I can't do anything in the world, where would
    you put them for those first three weeks?

A   An eight.

Q   And what would you say about that now?

A   I would say they're about a six.

Q   Are you having problems with it right now as we
    sit here?

A   No, not at the moment.

Q   When did you last have a headache?

A   Last week.

Q   And what do you do for your headache?

A   The only thing I can take right now is Tylenol.

Q   And that's because of the pregnancy, right?

A   Correct.

Q   Where are you going now for pregnancy stuff?

A   The Woman's Clinic on the Westbank Expressway
    in Gretna, Louisiana.

Q   You said the Woman's Clinic on Westbank
    Expressway?

A   Yes.  They're connected to Ochsner.

Q   What isn't these days, right?  And how long

have you been going to that clinic?

A    Since December of last year.

Q    Is that when you realized you were pregnant?

A    Yeah.

Q    Who is the baby's father?

A    Brannon Coleman.

Q    Y'all don't live together, you said that, right?

A    No.

Q    What would you consider Mr. Coleman to you?

A    Just a friend.

Q    Do you have an ongoing relationship?

A    Yes, as friends.

Q    I mean, boyfriend, like --

A    No, not any more.

Q    Not any more?

A    No, we're not in a relationship any more.

Q    When -- during what period of time were you in a relationship?

A    It's been off and on.

Q    Okay.

A    -- since 2000 and  -- I want to say 2008.

Q    And I think you said you spoke to him, like yesterday, right?

A    Uh-huh -- yes.

60

Q   And so even though y'all are still on a
relationship and you're having headaches and
dizziness and neck pain, you've never discussed
the incident at Dillard's with him?

A   No.

Q   Why not?

A   It's none of his business.

Q   You haven't said, "Hey, my neck hurts, you
know, give me a back rub," anything like that?

A   No.

Q   Is there anyone you have talked about these
injuries with?

A   My mom.

Q   What have you and your mom talked about?

A   Just how I feel, that's basically it.

Q   All right, so tell me what happened when you
first went to Advanced Medical Center in
November of 2016.

A   They just pretty much did an assessment of what
I would need as far as therapy.

Q   Okay, and what did they tell you?

A   That I would need -- I want to say they call it
electrodes, it's like wires that they hook up
in my back.  And two exercises that I would do
to help with my upper body strength.  And

another thing was a wedge that I had to put my neck up against and move my head from right to left.

Q It says that they told you to treat two times a week for about four weeks; does that sound about right?

A Yeah.

Q And when you would go in to treat, would you just go, sign in, they do the electrotherapy and then -- for about ten minutes, and then you leave?

A Yes, and sometimes I would go and they would tell me I had to see a chiropractor for a re-exam, or maybe the medical doctor.

Q Is the chiropractor Dennis Gruwell?

A Yes.

Q How many times do you think you've seen him since this accident occurred?

A I can't recall the actual number.

Q I guess I should have asked you. What kind of frequency do you see him?

A Maybe every two months.

Q I also have a note of a Dr. Jerome Kurpel; do you know who he is?

A Yes.

Q    Is he another chiropractor, or is he an MD?

A    The MD.

Q    How many times have you see him?

A    Three times.

Q    When did you last go to Advanced Medical Center for treatment?

A    In May.

Q    So over two and a half weeks ago?

A    Yes.

Q    What happened at that May appointment, did they discharge you?

A    No.

Q    What did they tell you?

A    I just continue to do therapy twice a month.

Q    When did they switch it from multiple times a week to two times a month?

A    I'm going to say a month prior to May.

Q    So in April?

A    Yeah.

Q    Have you ever been told to undergo an MRI?

A    Yes.

Q    When did they first tell you to undergo an MRI?

A    That January, after November.

Q    So within a couple of weeks -- couple of months, right?

A    Yeah.

Q    Why haven't you undergone an MRI in the last year and a half?

A    I'm trying to get an appointment.

Q    What's preventing you from getting an appointment?

A    I was referred to different clinics, I guess that do them, and when you get on the phone it's just like a runaround, for whatever strange reason.

Q    Have you talked to Dr. Gruwell or Dr. Kurpel about that?

A    Yeah.

Q    What do they say?

A    They would just tell me to keep trying.  I would ask them if they can refer somebody, they normally would tell me no.

Q    Do you know why?

A    No, I don't.

Q    Because I see in each one of these appointments they say you need to go get your MRI and --

A    Correct.

Q    -- it hasn't been scheduled yet.  You'd agree with me that if you've got a significant problem, then you need to go get an MRI like

yesterday, right?

A    Yes.

Q    So tell me all the efforts you've made to undergo an MRI in the last year and a half.

A    I would call to see --

Q    How many times a week?

A    Maybe like three times a week.

Q    Okay, and who would you call?  Tell me every place you called to get an MRI.

A    I don't know their exact names.  I would look online for them.

Q    How many places have you contacted?

A    Like, four.

Q    So you're telling me you contacted -- how often would you contact each of those four places?

A    Like three times a week.

Q    You called each of those four places three times a week for the last year and a half?

A    Yes.

Q    And none of them have been able to schedule you?

A    No.

         MR. MURA:

              I don't think she's been doing that for a year and a half because when she got

pregnant --

THE WITNESS:

Yeah, they told me I couldn't get one.

MR. CAMELFORD:

Okay.

MR. MURA:

-- they terminated the request for the MRI.

MR. CAMELFORD:

Q    All right, so then we'll go through December. For the entire year of 2017, you were calling the same four places three times a week and not one of them can get you in?

MR. MURA:

I think she got pregnant before that.

MR. CAMELFORD:

She didn't find out until December, though.

MR. CAMELFORD:

Q    That's true, right, you found out you were pregnant in December?

A    Yes.

Q    So is it true that you were calling those MRI places up until December?

A    Yes.

Q    And you were calling four places three times a week?

A    They did not tell me at first, when I first started going to Advanced Medical, that I needed an MRI.

Q    Okay, you said they told you the first time in January of 2017, though, right?

A    Yes.

Q    So between January and December, that's 12 months.

A    Yeah.

Q    During those 12 months, you were calling four places three times a week and none of those places could get you in for a whole year?

A    Correct.

Q    Do you have the list of those places anywhere that you could get?

A    No.

Q    But how are you locating those four places, then?

A    The numbers would just be in my phone.  I never saved the numbers or anything, I would just be calling them.

Q    And -- I mean, this seems obvious, but is it true you're not going back to therapy right now

because of the pregnancy?

A    No, I still go to therapy.

Q    When did you last do therapy?

A    May.

Q    Okay, but for the last three weeks, why haven't you been back?

A    I only go two times a month.

Q    Okay, do you plan to go again before July 3rd?

A    Yes.

Q    Do you have an appointment set up, or you just show up and sign in?

A    I have an appointment set up.

Q    When is the appointment set up for?

A    The next appointment is this week on Thursday, and the next one, I believe she put it for next week on Tuesday or Wednesday.

Q    So those electrotherapy appointments, you actually set an appointment, you don't just show up and they take you?

A    They can.

Q    They can do both?

A    Uh-huh.

Q    Okay, so if you wanted to get therapy like right after this deposition, you could go over there and just go in and sign in?

A    Yes.

Q    And are they changing anything that you're
     doing at those therapy appointments over the
     last year?

A    They have.

Q    How has it changed since that first appointment
     in November when you told me they did the
     electrotherapy?

A    The first one they would put me on a bed, it
     was like a massage bed with the electrolytes
     (sic) --

Q    Uh-huh.

A    -- in my back, and the -- the wedge, I would be
     on the wedge, as well, and I would do exercises
     that went -- from not doing the exercises to
     just doing the electro's and the wedge.  And
     the third time they adjusted, I think I was
     just doing the electrodes, and then they went
     back to doing the exercises and the electrodes.

Q    Okay.  I asked you, I think, about the
     dizziness and headaches, and you said at that
     first appointment you thought it was about an
     eight, and now you feel like it's about a six.
     Tell me about your neck.  At that first
     appointment, where would you put your neck on

the same scale?

A    About an eight.

Q    And has your neck improved?

A    Yes.

Q    How is it now?

A    I can do some movement to the right, but the left is still sore.

Q    So on that same scale we're talking about where are you at now?

A    I would say a six.

Q    Have you seen a neurologist?

A    No.

Q    Have you seen anyone other than the doctors or chiropractors at Advanced Medical Center since you started going to Advanced Medical Center?

A    Other than for my pregnancy, no.

Q    Thank you, that's exactly the clarification I needed.  Have you been back to that Urgent Care for any reason since the accident?

A    No.

Q    Do you know who put that mannequin up in Dillard's?

A    No.

Q    You don't know who created the display?

A    No.

70

Q   And you don't know how long it had been there
    prior to your incident?

A   No.

Q   I think you told me this earlier, but have you
    ever heard of one of those mannequins falling
    on anybody else?

A   No.

Q   And you don't know what caused it to fall on
    the day it hit you, right?

A   Correct.

Q   All right, so one of the questions I sent your
    attorney beforehand was, "What is it you think
    Dillard's did wrong?"  Okay, and so tell me in
    your own words now, what is it you think
    Dillard's did wrong?

A   Could you clarify what you mean "what did they
    do wrong?"

Q   Well, you're telling me that you think -- well,
    do you think it was Dillard's fault that the
    mannequin fell on you?

        MR. MURA:

            I think -- I'm going to -- I'm going to
        have to object to that, Jason.

        MR. CAMELFORD:

            Okay, well, subject --

MR. MURA:

I think we're getting into a legal causation of custody and guard and control and all that stuff.

MR. CAMELFORD:

Q Sure. Subject to the objection, you can answer. What is it you think that Dillard's did wrong?

A I don't think it's anything -- whether if they did anything wrong. I mean, there could have been some type of precaution in how the mannequin was sitting up on top the shelf. Maybe it could have been connected to something to prevent it from falling off the shelf. There was nothing to stop the mannequin from falling.

Q Do you have health insurance now?

A Medicaid.

Q Medicaid now?

A Yes.

Q When did you start Medicaid?

A For my pregnancy, in February.

Q Do you know if Medicaid has paid any of the bills related to the treatment at Advanced Medical Center?

A    No, they haven't.

Q    They're just paying for the --

A    Pregnancy.

Q    -- pregnancy?  Has anyone sent anything -- you
     had Blue Cross/Blue Shield from work at the
     time of the accident, right?

A    Yes.

Q    Did they pay anything for any of the treatment
     you've undergone?

A    No.

Q    When you went to Advanced Medical Center, did
     they say, "We'll bill your attorney and your
     attorney will worry about it"?

A    I didn't deal with any of that.

Q    If you ever receive any paperwork from either
     Medicaid or the doctor or anything saying you
     were in an accident, we need to recover
     anything, it's called a lien letter, you need
     to give that to your attorney, okay?

A    Okay.

Q    When did you start taking that leave from
     nursing school?

A    A week and a half ago.

Q    What are you doing all day now?

A    I'm just prepping for the baby, cleaning, or go

run errands.

Q    Are you prevented from doing anything you want
     to do as a result of either the neck pain or
     the headaches and dizziness?

A    No, I just have to do it slower, that's all.

Q    So you can do everything you used to be able to
     do, you think you just have to do it a little
     slower; is that right?

A    Yes.

Q    Now, we may end up in a courtroom at some point
     and you may end up in front of a jury and
     judge, and I'm going to ask you the question.
     Tell me how this incident at Dillard's has
     changed your life, what would you tell me?

A    I'm used to being very energetic.  I'm used to
     moving around.  Pretty much I was healthy
     before the incident, and I can't move around as
     fast as I want to any more.

Q    Is there anything specifically that you're
     prevented from doing that you could do before?

A    Lifting.

Q    What lifting?

A    Like if I'm just picking up something, I have
     to really be cautious of how I'm picking it up.
     As far as turning, if I turn my head too quick,

it may be painful.  The way I sleep.  I can't sleep like I want to even before the pregnancy, I can't just lay down like I want to.

Q    Anything else?

A    That's pretty much it.

Q    You told me before that you had pictures from the wedding.  Since the accident, do you have any other photos or video that you've taken that either show you doing things or not doing things that you'd say, "Hey, look, here's a photo of me not doing X, Y and Z because of the pain I have"?

A    No.

Q    Have you received any other compensation for this accident; you know, any other sources, or any other income because of it?

A    No.

Q    Are you receiving any medication now?  Just Tylenol, I think you said?

A    Tylenol.

Q    During 2017, before you found out you were pregnant, was there any additional medication you were taking?

A    Yes.

Q    What were you taking then?

A   They have prescriptions that's written out.
Some of them I don't know the names for it.

Q   Were you taking them?

A   Uh-huh.

Q   Yes?

A   Yes.

Q   Have you ever had any injections because of the pain?

A   No.

Q   When did you start feeling the tingling that you said you're feeling through your right hand?

A   Had to be maybe a couple -- that was one of the reasons why they want to do the MRI.

Q   Okay.  The first time -- I was just looking back, and the first time that I see a record of it is around August of last year; does that sound right, or do you think you were complaining about it before?

A   I was complaining about it before.

Q   Do you have any idea when you first complained about it?

A   No.

Q   Have they told you that that's related to this incident or not related to this incident?  What

treatment have they said you need to undergo because of that?

MR. MURA:

Whoa, whoa, slow down, Jason, compound.

MR. CAMELFORD:

Yeah, that's fair.

MR. CAMELFORD:

Q   What have they told you about the numbness and tingling, and what causes it?

A   They didn't really tell me what causes it, they just said that I need to get tests ran to see what it can possibly be connected to.  That it can be connected with my spine.

Q   What tests did they tell you you need to have?

A   The MRI.

Q   And was it your understanding that's a neck MRI?

A   No.

Q   If you don't know, tell me no.

A   No.

Q   They haven't suggested any other tests?  For example, have they told you you need an EMG?

A   No.

Q   Any nerve conduction testing?

A   No.

Q    Those aren't things you've heard about?

A    No.

Q    They just said you need to get an MRI?

A    Yeah, an MRI.

Q    Has anyone told you that you're having that numbness and tingling and that it was caused by this accident?

A    No.

Q    Earlier you were telling me that you have to be more careful lifting.  I don't see in your records any lifting restrictions.  Are you aware of any doctor saying don't life more than some amount?

A    No, they never said that.

Q    When you were working at Burger King for the months -- for a year and a half afterwards, tell me what your job duties were.

A    I was a manager.

Q    Did that include picking stuff up and carrying it around?

A    No, I get other people to do that.

Q    So you didn't have to carry anything?

A    Yeah, I've had to carry stuff before.

Q    What would you have to carry during that period of time?

A    Maybe bags of food, that could be like three pounds.

Q    Only light stuff?

A    Yeah.

Q    Did you have to carry big cases of french fries or something, someone else would do all that?

A    Yes, someone else would do it.

MR. CAMELFORD:

I don't think I have any other questions for you, Ms. Stirgus.  I really appreciate your time today.  I don't know if your attorney has any.

MR. MURA:

Jason, I'm going to ask you on the record, I know we've talked about it, but you used the term in the deposition, you said, "If the video would show other mannequins in the area," and I thought I was told there were no video in this accident.

MR. CAMELFORD:

No, I've given you a copy of the video. There's no video directly of it, there's --

MR. MURA:

I don't have a copy of any video.

MR. CAMELFORD:

Okay, well, I apologize that you didn't get it. I thought that had been sent to you.

MR. MURA:

So was that -- is this the video the day of the accident?

MR. CAMELFORD:

Yes. Here.

MR. MURA:

What we got?

MR. CAMELFORD:

I'm going to give you a copy of it. We can go off the record.

-- OFF THE RECORD --

MR. MURA:

I don't have any questions. We will read and sign, though, Ms. Court Reporter. Thank you.

THE WITNESS WAS EXCUSED.

DEPOSITION CONCLUDED AT 3:30 P.M.

REPORTER'S PAGE


        I, Cynthia M. Hare, Certified Court Reporter, in
and for the State of Louisiana, the officer, as defined in
Rule 28 of the Federal Rules of Civil Procedure and/or
Article 1434 (b) of the Louisiana Code of Civil Procedure,
before whom this sworn testimony was taken, do hereby state
on the Record:

        That due to the interaction in the spontaneous
discourse of this proceeding, dashes (--) have been used to
indicate pauses, changes in thought, and/or talkovers; that
same is the proper method for a Court Reporter's
transcription of a proceeding, and that the dashes (--) do
not indicate that words or phrases have been left out of
this transcript;

        That any words and/or names which could not be
verified through reference material have been denoted with
the phrase "(spelled phonetically)."



                            Cynthia M. Hare, CCR

                            Certified Court Reporter
                            Louisiana License #2010007

CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this certificate.

I, CYNTHIA M. HARE, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that SONYA STIRGUS, after having been duly sworn by me upon authority of R.S. 37:2554, did testify on the 19th day of June 2018, at New Orleans, Louisiana, as hereinbefore set forth in the foregoing 80 pages; that this testimony was reported by me in the Voicewriting reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is true and correct to the best of my ability and understanding; that the transcript has been prepared in compliance with the transcript format guidelines required by statute and rules of the board; that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and rules of the board; that I have no

actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter; that I am not related to counsel or to any of the parties hereto, I am in no manner associated with counsel for any of the interested parties to this litigation, and I am in no way concerned with the outcome thereof.

This 25th day of June 2018, Metairie, Louisiana.

Cynthia M. Hare, CCR

Certified Court Reporter
Louisiana License #2010007

## A
**ability** 81:16
**able** 25:11 27:6 64:20 73:6
**absent** 13:12,16
**accessories** 29:8
**accident** 5:11 8:15 9:5,25 14:5,9 18:23 25:6,11 26:20 29:11,15 32:7 34:9,19 36:16 53:21 61:18 69:19 72:6,17 74:7,15 77:7 78:20 79:7
**accompanied** 81:3
**accurate** 37:10 46:18 47:20
**accurately** 37:3,21
**acted** 81:22
**action** 54:4
**actual** 13:20 21:4 49:21 61:19 82:1
**additional** 74:22
**address** 10:6,7,24 11:2,7 13:19,20 16:22,24 17:3 21:3,4 27:3 31:17
**adjusted** 68:17
**Advanced** 54:22 55:2,19 57:14 58:1 60:17 62:5 66:4 69:14,15 71:24 72:11
**African** 44:23
**afternoon** 5:5,8
**ago** 39:25 62:8 72:23
**agree** 33:17 48:19 63:23
**alcohol** 34:14
**Algiers** 10:16 20:23 48:25 57:4,7
**allegations** 24:21 24:23
**American** 44:23
**amount** 25:5 77:13

**and/or** 80:5,11,16
**answer** 3:17 6:1,5,7 11:17 31:7 71:7
**answering** 7:5
**answers** 3:14 8:5 52:8
**anybody** 48:2 70:6
**apartment** 10:17 16:17,18 17:15 27:10
**apartments** 17:6
**apologize** 14:25 79:2
**APPEARANCES** 2:1
**appointment** 62:10 63:4,6 67:10,12 67:13,14,18 68:6 68:22,25
**appointments** 63:20 67:17 68:3
**appreciate** 78:11
**appropriate** 3:8
**April** 62:18
**area** 8:22 29:9,15 35:15 37:22 40:1 40:9,14 78:18
**arm** 8:19
**arrangement** 81:20
**arrangements** 81:21
**arrest** 26:10
**arrested** 25:22,24 26:11
**Article** 80:6 81:25
**asked** 12:22 39:5 43:15,16 47:16 52:18 61:20 68:20
**asking** 6:6,6
**assessment** 60:19
**assets** 22:19
**assistant** 23:11,15 23:21 24:5,9
**associate** 43:4,7 44:21 45:13
**Associate's** 18:19 18:20

**associated** 82:8
**associates** 41:13
**ate** 33:4 34:2
**attention** 36:6
**attorney** 5:17,21 6:19 7:1 8:4,10 14:15 36:13 55:4 55:9,14,15,16 70:12 72:12,13,19 78:12
**August** 13:2 16:11 75:17
**authority** 81:9
**Avenue** 1:13 2:5 10:16,17,23 11:2 16:21
**aware** 77:12

## B
**b** 80:6
**B-R-A-N-N-O-N** 13:10
**B-R-E-N-N-A-N** 13:9
**Babies** 28:20,21
**baby** 28:19 72:25
**baby's** 59:5
**back** 8:5 9:4 12:14 12:17 16:11,13,24 17:2,13,19 27:13 27:15,17 28:9 41:8 52:14 53:8 53:24 57:5 60:9 60:24 66:25 67:6 68:13,19 69:18 75:16
**background** 7:16
**bad** 58:4,4
**bags** 78:1
**base** 9:11
**basically** 60:15
**bed** 68:9,10
**beeline** 35:14
**beginning** 1:15 8:3
**Behrman** 10:16,16 10:23 11:2 16:21
**beige** 42:9

**believe** 17:17 22:17 25:7 67:15
**Bell** 15:23
**bells** 45:14
**bend** 52:2
**bent** 42:1,15
**best** 30:16 32:18 81:16
**big** 20:18 78:5
**bill** 55:18 72:12
**bills** 27:1 54:13 71:24
**birth** 11:12 13:1
**bit** 6:22 29:10 53:16 57:25
**black** 37:8 42:3
**Blue** 72:5
**blurry** 8:12 53:16
**board** 20:8 81:19 81:25
**body** 39:10 56:20 60:25
**book** 5:24
**born** 11:18
**bothering** 44:12 50:24 51:15
**Boulevard** 21:11 56:11
**boyfriend** 59:14
**Brannon** 13:8 59:6
**break** 6:25 7:4 12:10
**Brianna** 9:24 12:23
**Brianna's** 13:1,7
**Brittany** 31:12,12 31:13,14
**Brittany's** 31:17
**broke** 19:12
**brother** 16:12 17:10
**bunch** 5:18 8:4,5 22:7 40:13
**Burger** 18:23 20:22 21:7,17 22:6 23:7 25:14 26:22 77:15
**BURR** 2:8
**business** 15:12 60:7

**Butler** 31:12
**buy** 46:3

## C
**C-O-L-E-M-A-N** 13:10
**calender** 49:5
**call** 9:23 60:22 64:5 64:8
**called** 10:2 64:9,17 72:18
**calling** 65:11,23 66:1,12,23
**Camelford** 2:8 4:3 5:4,9 36:17,25 37:15,19,24 38:2 46:24 47:11,15 65:4,9,16,19 70:24 71:5 76:5,7 78:8,21 79:1,8,12
**captioned** 1:10
**car** 33:15
**care** 48:21,25 49:8 54:5 55:25 57:4,7 57:10 69:18
**career** 22:11
**careful** 77:10
**Carr** 14:24
**Carrollton** 1:13 2:5
**carry** 77:22,23,24 78:5
**carrying** 77:19
**case** 8:3 20:5 54:12
**cases** 78:5
**catch** 45:10,16
**Cathedral** 49:25 50:2
**Caucasian** 45:5
**causation** 71:3
**cause** 1:10
**caused** 70:8 77:6
**causes** 76:9,10
**cautious** 73:24
**CCR** 80:22 82:17
**cell** 14:12
**Center** 55:19 57:15 58:2 60:17 62:5

69:14,15 71:25 72:11
**Cents** 25:4
**certain** 52:6
**certificate** 81:1,4
**certification** 81:2
**Certified** 1:12 3:6 80:3,23 81:5 82:18
**certify** 81:8
**change** 22:16
**changed** 30:13 68:6 73:14
**changes** 80:11
**changing** 68:2
**children** 9:24
**Chip** 2:4 55:5
**chiropractor** 61:13 61:15 62:1
**chiropractors** 69:14
**chose** 16:4
**church** 49:24 50:1
**Cindy** 5:20 6:18 37:25
**Civil** 3:9 80:5,6 81:24
**claim** 9:17 19:12,16 19:18 20:11 26:15
**claiming** 8:15
**clarification** 69:17
**clarify** 9:10 70:16
**clean** 6:23
**cleaning** 72:25
**clear** 6:7 8:1
**cleared** 26:7
**Clearview** 50:12
**clinic** 56:11,12,21 58:20,22 59:1
**clinics** 63:7
**close** 19:20,21 24:16
**closed** 24:24
**CNA** 18:5
**Code** 80:6 81:24
**Coleman** 13:8,10 14:9 59:6,10

**Coleman's** 13:19
**come** 10:4 44:15,22 49:19
**company** 21:18 22:10 24:6
**compensation** 26:15 54:16 74:14
**complained** 75:21
**complaining** 75:19 75:20
**complaints** 23:8
**complete** 81:20
**completely** 11:17
**complex** 17:15
**compliance** 81:17 81:22
**compound** 76:4
**concerned** 82:10
**CONCLUDED** 79:21
**concussion** 8:18 48:15
**conduction** 76:24
**Congratulations** 27:8
**connected** 58:24 71:13 76:12,13
**connection** 1:10 3:11
**consciousness** 52:16,19
**consider** 59:10
**consume** 34:14
**contact** 64:15
**contacted** 64:12,14
**continue** 62:14
**continued** 15:21
**contractual** 81:23 82:2
**control** 71:3
**copy** 4:9 12:9 36:19 78:22,25 79:13
**correct** 9:17 10:3 13:18 14:10,19 15:19 18:25 24:17 24:19 31:3,16 33:19,24 34:10

41:5 42:11,18 46:19 47:18,23 52:16,18,20 58:18 63:22 66:15 70:10 81:15
**correctly** 48:23
**counsel** 3:2,3,7,15 82:6,8
**couple** 7:2 36:12 39:25 41:1 44:5 62:24,24 75:13
**court** 1:1,12 3:6,22 5:20 20:9,12 36:20 79:18 80:3 80:12,23 81:5 82:3,18
**courteous** 43:18
**courtesy** 6:10
**courthouse** 20:19 20:20
**courtroom** 73:10
**created** 69:24
**Cross/Blue** 72:5
**cry** 44:4
**crying** 41:17 44:3
**current** 10:6 13:19 27:3
**custody** 71:3
**customer** 31:5 46:6
**Cynthia** 1:11 3:6 80:3,22 81:5 82:17

_____

**D**

**dancing** 50:18,21
**dashes** 80:10,13
**date** 11:12 13:1
**daughter** 14:4
**day** 1:14 31:9,10,15 32:4,6,13,19 33:1 34:12 48:7 49:11 51:2,5 70:9 72:24 79:7 81:10 82:11
**days** 48:24 49:18 49:18 51:23,24 57:18,18 58:25
**deal** 72:14

**dealing** 56:20
**December** 59:2 65:10,17,21,24 66:9
**defendant** 2:7 3:7
**defense** 3:3
**defined** 80:4 81:24
**DeGaulle** 17:5 21:6 21:13
**degree** 18:18,20
**Delgado** 15:10,11 15:15 17:24
**Dennis** 61:15
**denoted** 80:17
**department** 1:7 2:7 35:6,8
**depends** 22:3
**depict** 37:21
**depiction** 37:10
**depicts** 37:7
**deposition** 1:9 3:4 3:11,18,19 5:14 7:1,23 67:24 78:16 79:21 81:22
**describe** 44:21 45:4
**difference** 24:7,9
**different** 20:20 21:25 22:25 29:10 63:7
**DILLARD** 1:7 2:7
**Dillard's** 5:10,12 7:17 29:1,3 31:9 32:5,13 34:5,7,22 36:15 47:24 50:16 53:12,22 60:4 69:22 70:13,15,19 71:7 73:13
**dinner** 33:4,6 34:1 34:3
**direct** 82:2
**direction** 81:15
**directly** 22:6 41:7 42:23 78:23
**disability** 26:17
**disagree** 40:15,18 40:24
**disbelief** 43:14

**discharge** 62:11
**disclosed** 36:13
**discourse** 80:10
**discovery** 18:22 29:2
**discussed** 14:5 60:3
**display** 40:3 69:24
**District** 1:1,2 20:9 20:12
**dizziness** 8:12 51:3 57:16,20,24 58:2 60:3 68:21 73:4
**dizzy** 44:8 48:10 51:1
**doctor** 48:5,11,12 48:20,24 49:7,17 51:4,9 56:4 61:14 72:16 77:12
**doctors** 56:23 69:13
**documentation** 54:3
**documents** 7:22
**doing** 23:10 25:12 25:13,17 28:5 34:11 38:22 52:3 53:11 64:24 68:3 68:15,16,18,19 72:24 73:2,20 74:9,9,11
**Dollars** 25:4
**doors** 35:11,12
**Dr** 61:23 63:11,11
**drawer** 17:20
**Drive** 21:10
**drive-thru** 19:13 19:15,16,19
**driver's** 4:9 12:6
**dropped** 32:19
**dropping** 33:7
**drove** 33:15
**drugs** 34:16
**due** 19:12 28:22 80:9
**duly** 5:2 81:8
**duties** 77:17

**E**

**E** 2:4
**earlier** 12:22 32:18 70:4 77:9
**easier** 5:16
**EASTERN** 1:2
**easy** 6:4
**eating** 33:6
**Edna** 14:24 15:6
**education** 7:16 14:20 15:9 17:25
**efforts** 64:3
**eight** 21:18 23:6 28:24 32:10 57:3 58:7 68:23 69:2
**either** 6:18 27:5 45:10 72:15 73:3 74:9
**elbow** 8:20
**electro's** 68:16
**electrodes** 60:23 68:18,19
**electrolytes** 68:10
**electrotherapy** 61:9 67:17 68:8
**Elementary** 32:20
**Elysian** 32:24
**email** 37:25
**EMG** 76:22
**employment** 7:17 82:1
**ended** 15:18 32:5
**energetic** 73:15
**enjoying** 50:16
**entire** 65:11
**entity** 81:21
**entry** 35:5
**ER** 56:7
**errands** 73:1
**ESQUIRE** 2:4,8
**evacuate** 11:22
**evening** 32:8
**event** 29:22
**eviction** 17:17
**evidence** 3:20
**exact** 64:10
**exactly** 50:8 69:17

**exam** 61:14
**EXAMINATION** 4:3 5:4
**examined** 5:2
**example** 76:22
**EXCUSED** 79:20
**exercises** 60:24 68:14,15,19
**Exhibit** 4:9,10,11 4:12 36:19,21,23 36:23,23
**EXHIBITS** 4:8
**experiencing** 57:15
**Expressway** 49:25 50:3 58:20,23
**extra** 48:6

**F**

**face** 41:17
**facilities** 57:11
**fair** 14:8 28:7 36:10 37:9 38:18 42:17 47:20 76:6
**fairly** 37:3,21
**fall** 38:13 40:6 41:3 42:20 70:8
**falling** 31:5 39:11 39:16 70:5 71:14 71:16
**falls** 38:18 53:20
**familiar** 29:19
**family** 16:6 27:2,5
**far** 60:20 73:25
**fast** 28:2 51:1 53:18 53:19 73:18
**father** 13:5,7,12 59:5
**fault** 70:19
**February** 11:12 57:2 71:22
**Federal** 3:9 80:5
**feel** 15:3 48:6,7,12 60:15 68:23
**feeling** 49:20 75:10 75:11
**feet** 40:2
**fell** 30:14,18 34:22

35:18 37:5,10,22 39:21 41:4 42:12 42:19,21,23 52:15 70:20
**felt** 49:19
**female** 44:23
**feminine** 56:20
**Fields** 32:24
**fight** 20:1
**fighting** 20:4
**file** 20:9 54:6
**filed** 26:13
**finally** 51:7
**financial** 81:20
**find** 28:1 65:17
**fine** 21:16
**fines** 26:8
**finger** 56:5
**finish** 6:6 7:5
**finished** 47:24
**finishing** 15:18
**firm** 82:3
**first** 22:22 37:1,20 44:21 49:6 53:8 55:9,11 57:14 58:1,6 60:17 62:22 66:3,3,6 68:6,9,22,24 75:15,16,21
**Fisher** 32:20
**five** 16:20 40:2 49:18 51:23 57:11
**five-eight** 45:1
**five-five** 45:2
**floor** 41:18 43:2
**follow-up** 47:13
**followed** 6:1
**following** 1:11 33:1 49:16 51:2
**follows** 5:3
**food** 28:2 78:1
**foregoing** 81:12
**forget** 6:17 12:13
**forgot** 16:4
**form** 3:16
**formalities** 3:10
**format** 81:18

**FORSTALL** 2:4
**Forstall's** 55:5,22
**forth** 81:11
**forward** 20:14
**found** 65:20 74:21
**four** 23:17 27:9 61:5 64:13,15,17 65:12 66:1,12,19
**Fourteen** 25:4,7
**frame** 38:16
**franchiser** 22:10
**franchises** 22:7,8
**free** 15:3
**french** 78:5
**frequency** 61:21
**Friday** 49:13,16 53:9
**friend** 59:11
**friends** 59:13
**fries** 78:5
**front** 37:2 73:11
**fun** 50:13
**future** 54:4

**G**

**GALLOWAY** 2:8
**games** 38:25
**garment** 35:4
**general** 17:5 21:6 21:13 23:18 40:1
**generally** 17:4 50:10 54:11
**getting** 23:23 56:2 63:5 71:2
**girdle** 35:3 37:18 42:7,8 47:25
**give** 6:10 60:9 72:19 79:13
**given** 3:22 5:14 78:22
**GM** 24:10
**go** 5:25 11:25 14:23 15:8,15 17:13 20:9,12,14 24:25 27:13 28:9 29:6 29:23 31:25 33:15 33:20 35:3 42:24

48:5,10,12,23 49:17 51:4,6,7,9 51:18 53:8 54:12 55:1,2,14,15,16 55:22 56:4,7 61:8 61:9,12 62:5 63:21,25 65:10 67:2,7,8,24,25 72:25 79:14
**God** 43:9,11
**goes** 24:10
**going** 5:22,23 6:3 7:15,15 12:9,12 20:7 27:3,9,15,17 27:22,23,24,25 28:18 32:5 33:8 34:8 46:3 47:13 58:19 59:1 62:17 66:4,25 69:15 70:22,22 73:12 78:14 79:13
**good** 5:5,8 6:15 31:23 38:8
**gotten** 57:20
**GPS** 22:15 23:5
**grabbed** 43:10
**graduate** 14:20 15:6,13
**graduated** 15:8
**Gretna** 20:13 26:4 58:21
**ground** 5:16
**Gruwell** 61:15 63:11
**guard** 71:3
**guess** 38:11 43:14 43:21 61:20 63:7
**guidelines** 81:18
**guy** 22:20 47:21

**H**

**hair** 32:24 33:8,11 33:13
**hairdresser** 32:24
**half** 15:16 17:23 22:14 62:8 63:3 64:4,18,25 72:23

77:16
**hand** 8:19 75:12
**handwriting** 23:3 47:2,6
**handy** 14:11
**hang** 33:20
**happen** 12:15
**happened** 7:17 8:2 8:8 16:10 20:3 26:6 29:1 32:7 39:6 41:12 43:7 43:19 44:14 45:22 49:13 60:16 62:10
**happening** 6:16 42:16
**happens** 35:22,24
**Harahan** 50:11
**Hare** 1:12 3:6 80:3 80:22 81:5 82:17
**Harvey** 21:23
**head** 6:14 30:10 36:3 38:7,13 41:7 42:23 43:15 52:4 52:12,15 61:2 73:25
**headache** 44:9 48:10 58:13,15
**headaches** 8:11 57:15,19,23 58:2 60:2 68:21 73:4
**health** 71:17
**Healthcare** 18:3,4
**healthy** 73:16
**hear** 6:22 41:14
**heard** 31:4 43:9 70:5 77:1
**height** 44:24 45:8,9
**help** 27:2,12 60:25
**hereinbefore** 81:11
**hereto** 3:10 82:7
**Hey** 60:8 74:10
**high** 14:21 15:8
**higher** 42:10
**hit** 41:7,24 43:14 70:9
**hits** 36:3 41:21
**hitting** 36:1 38:7

**holding** 41:17
**Holiday** 21:10
**home** 33:20 34:2 46:1 48:1
**hook** 60:23
**hope** 7:8
**horrible** 44:8
**hospital** 15:25
**Hospitality** 22:15 23:5
**hour** 25:2,8
**hours** 23:24 32:17 33:12,18 34:24
**house** 11:10,15 33:20
**huh** 37:14
**hurricane** 15:17 16:10
**hurt** 44:7 53:24
**hurts** 60:8

**I**

**idea** 31:2 36:7 38:5 39:21 41:3,9 75:21
**illegal** 34:16
**immediately** 41:12 42:12 44:10,17
**important** 6:2,12
**improved** 57:20 69:3
**incident** 39:6,6 45:23 46:6 49:21 52:1 55:12,13,24 56:14 57:12,21 60:4 70:2 73:13 73:17 75:25,25
**include** 77:19
**income** 26:21,24 74:16
**increase** 23:10
**INDEX** 4:1
**indicate** 80:11,14
**indicating** 9:6 42:5
**indirect** 82:2
**individually** 36:22
**informed** 81:19

**injections** 75:7
**injuries** 8:7,13 25:16 50:15 53:12 56:16,25 60:12
**injury** 48:21 56:24
**Institute** 18:3,4
**insurance** 71:17
**intend** 10:3
**intended** 54:6
**intention** 27:14
**interaction** 80:9
**interested** 82:8
**interrogatory** 32:15
**interrupt** 50:20
**item** 45:25 46:3
**items** 42:9
**IVAN** 1:6

**J**

**Jackson** 16:3,19
**Jaden** 9:24 12:23 13:11,12
**Jaden's** 13:3
**JANIS** 1:7
**January** 62:23 66:7 66:9
**Jason** 2:8 5:9 7:3 47:10 70:23 76:4 78:14
**Jeff** 17:10 56:12
**Jefferson** 20:19
**Jerome** 61:23
**job** 25:12 26:22 28:1 77:17
**JOHNSON** 2:8
**JR** 2:4,4
**judge** 1:6 73:12
**Judging** 38:7
**July** 13:4 28:23 67:8
**June** 1:14 81:10 82:11
**jury** 73:11

**K**

**K-A-R-L-I-K-O** 13:15

**Karliko** 13:14
**Katrina** 11:22,23 15:17 16:21 17:1 17:14
**keep** 7:8 15:4 22:3 25:12 63:15
**Kenner** 18:10
**kids** 7:10 10:14 11:16 12:22,23 14:17 24:1 27:14 32:19 33:3,6,7,15 33:17,25 38:20 39:15 41:2 48:3,4
**Kiera** 45:13
**kind** 6:20 22:19 28:24 42:9,20 51:22 52:6 61:20
**King** 18:23 20:22 21:8,17 22:6 23:8 25:14 26:22 77:15
**knew** 35:2
**know** 5:24,25 6:5 7:3,8 13:13,14,17 13:19,21 20:21 21:4,5,7,14,15 22:5,10,16 27:19 29:24 30:24 31:7 31:18,19,20 32:12 34:23 35:5 36:4 37:8 39:9,13,15 39:18 40:2,22 43:13,16,17,17 45:15,19 50:8 54:11 57:5,13 60:9 61:24 63:18 64:10 69:21,24 70:1,8 71:23 74:15 75:2 76:19 78:11,15
**knowledge** 30:16 82:1
**Kurpel** 61:23 63:11

**L**

**L** 3:1
**L.R** 1:6
**Landing** 16:19

**Landry** 45:13
**Lapalco** 56:11
**LAW** 2:4
**lawsuit** 26:13 54:6
**lawyer** 20:5
**lay** 52:5 74:3
**layout** 30:13
**learned** 48:15
**leave** 12:12,16 18:14 19:9 61:11 72:21
**leaving** 12:15
**left** 22:14 61:3 69:7 80:14
**legal** 54:4 71:2
**LEMELLE** 1:6
**let's** 28:25 29:24 49:5 56:13
**letter** 72:18
**letting** 24:24
**level** 57:23
**license** 4:9 12:6 36:20 80:23 82:18
**lien** 72:18
**life** 6:3 11:20 53:21 73:14 77:12
**lifting** 73:21,22 77:10,11
**light** 78:3
**line** 23:12 28:17
**lingerie** 29:16 30:6 35:7,15
**list** 8:1 66:16
**listed** 9:23
**listening** 15:1,4
**litigant** 82:4,5
**litigation** 5:10 82:9
**little** 5:23 6:22 16:14 29:10 37:2 49:19 53:16 57:25 73:7
**live** 10:23 16:20 17:11 59:7
**lived** 11:20 12:2 17:9 25:13
**lives** 10:13 14:16 31:20

living 10:15,19
  11:5 31:19
local 18:7,8 22:7,9
locating 66:19
location 21:20,23
  21:23,24 33:11,13
  36:15
locations 21:22
  22:5
long 7:4,9 10:9,23
  15:15 16:9 17:7
  18:11 21:16 33:11
  34:21 35:17 44:4
  46:2,5 53:3 58:25
  70:1
longer 33:18
look 7:22 23:2 49:5
  53:15 64:10 74:10
looked 47:19
looking 35:17,20
  35:23,25 36:2,5
  39:19 42:1,13,14
  75:15
lose 52:16,19
lost 9:17
lot 49:20
Louisiana 1:2,14
  2:5,10 10:18 11:9
  18:10 20:13,23,25
  31:22 50:11 58:21
  80:4,6,23 81:6,11
  81:24 82:12,18
low 9:4 57:4
lying 43:2,3

_____
M
_____

M 1:11 3:6 80:3,22
  81:5 82:17
M-C-G-H-E-E
  13:15
MacArthur 21:11
MAGISTRATE
  1:7
Magnolia 50:12
making 9:16 25:2,5
  81:21
male 45:5

manage 27:22
management 15:12
  22:2
manager 17:18
  19:3 23:11,15,18
  24:4,6,9 43:17,22
  43:24 44:15 45:4
  45:5,16,21 46:2
  77:18
managers 24:11
managing 18:23
mannequin 8:14
  30:14,18,24 34:22
  35:18 36:4 37:4,8
  37:10,22 38:3
  39:11,16,21 40:6
  41:3,6,9,15,21,23
  42:2,17,19 43:10
  52:1,15 69:21
  70:20 71:12,15
mannequins 30:21
  31:4 40:10,14
  70:5 78:18
manner 82:7
March 19:2,5,7
mark 36:18,19,22
Marrero 21:23
married 12:18,20
massage 68:10
material 80:17
matter 82:4,6
McGhee 13:14,15
MD 62:1,2
mean 8:24 9:1 34:1
  46:11,14 48:9
  50:20 54:9,10
  59:14 66:24 70:16
  71:10
meaning 42:21
means 13:16
meant 43:13 46:17
Medicaid 71:18,19
  71:21,23 72:16
medical 7:18 54:2
  54:22 55:2,17,19
  56:14,17 57:14
  58:1 60:17 61:14

62:5 66:4 69:14
  69:15 71:25 72:11
medication 34:18
  74:18,22
MEERVELD 1:7
member 25:20
members 27:2,5
merchandise 35:20
  35:23,25 39:18
  42:1,4
messed 17:14
Metairie 31:22
  82:11
method 80:12
  81:13
middle 41:7
military 25:20
minute 6:5 41:14
minutes 7:2 34:24
  34:25 35:19 39:23
  39:24,25 40:1,5
  41:1 44:5,17 46:4
  61:10
Mississippi 12:4
  17:18
mom 11:6,10 15:25
  17:12,18 27:12
  51:12 60:13,14
mom's 11:15 16:14
  17:13
moment 18:1 41:21
  44:12 48:6,13
  58:12
moments 38:22
Monday 51:17
  52:21
money 24:21
monitors 53:15
month 28:24 29:3
  29:23,24 62:14,16
  62:17 67:7
months 16:10
  18:13 29:25 57:3
  61:22 62:25 66:10
  66:12 77:16
move 11:15 21:25
  23:12 61:2 73:17

moved 16:21 50:25
movement 69:6
moving 50:18,21
  53:15,18 73:16
MRI 62:20,22 63:2
  63:21,25 64:4,9
  65:8,23 66:5
  75:14 76:15,17
  77:3,4
multiple 62:15
MURA 2:4 4:6
  37:13 46:21 47:1
  47:5,9 64:23 65:6
  65:14 70:21 71:1
  76:3 78:13,24
  79:5,10,16

_____
N
_____

N 3:1
name 5:5,9 13:14
  22:10 31:11 44:19
  45:12,15,17,19
  50:8,9
names 45:10 64:10
  75:2 80:16
near 30:18
neck 8:12,22,24 9:7
  9:12 50:25 52:7
  52:11,12 53:17,19
  53:24 60:3,8 61:2
  68:24,25 69:3
  73:3 76:16
need 6:25 7:2,3
  22:4 43:25 54:16
  54:17 60:20,22
  63:21,25 72:17,18
  76:1,11,14,22
  77:3
needed 13:22 29:22
  48:12 54:13 56:4
  66:5 69:18
negligee 37:9
nerve 76:24
neurologist 69:11
never 14:8 22:2
  38:9 60:3 66:21
  77:14

New 1:13 2:5,10
  10:17 11:9,18
  20:25 81:10
night 49:13,16
nodding 6:14
Nods 30:10
normally 29:6 52:3
  52:4 63:17
North 1:12 2:5
note 54:2 57:2
  61:23
notes 14:25
notice 30:15 40:9
noticed 30:21
November 55:1
  60:18 62:23 68:7
number 13:24
  14:11 32:15 37:7
  61:19
numbers 66:21,22
numbness 76:8
  77:6
numerous 17:5
  26:4
nursing 18:1,17,20
  28:12 72:22

_____
O
_____

O 3:1
o'clock 32:10
OB-GYN 56:8,9,22
object 70:23
objection 71:6
objections 3:15,19
  4:5
obvious 66:24
occurred 5:11
  18:24 25:6,11
  26:20 29:11,15
  34:19 36:16 38:23
  56:14 61:18
occurs 24:14
Ochsner 58:24
October 5:12 16:11
  25:6 32:17 56:24
  57:2
offered 3:20 43:22

44:14
**office** 55:5,22
**officer** 80:4 81:6
**OFFICES** 2:4
**oh** 19:7,14,21 22:25
  28:24 43:9,11
  46:16
**okay** 5:7,12 6:8,9
  6:11,20,23,24 7:6
  7:7,13,14,19,20
  8:8 9:1 10:15
  12:10,11,14 14:5
  14:15 15:4,5,18
  17:21 20:18,24
  22:5,13,22 23:16
  23:19 24:13 25:9
  28:6 29:1,19 30:8
  35:5 42:3,8,15
  43:25 46:16 47:12
  49:5,15 53:3
  54:18 56:13 59:21
  60:21 64:8 65:5
  66:6 67:5,8,23
  68:20 70:13,25
  72:19,20 75:15
  79:2
**old** 28:24
**once** 24:10 45:24
**ongoing** 59:12
**online** 18:7 64:11
**Open** 3:22 24:16
**options** 16:3
**orders** 53:16
**original** 81:3,4
**Orleans** 1:13 2:5
  2:10 10:17 11:9
  11:18 20:25 21:1
  81:11
**outcome** 82:10
**outlet** 50:12
**outset** 8:1
**outside** 42:20
**owned** 22:6
**owner** 22:17
**owning** 10:21
**owns** 11:10 22:7,8

**P**

**P** 3:1
**P-T-O-L-E-M-Y**
  11:8
**p.m** 1:15 79:21
**PAGE** 80:1
**pages** 81:12
**paid** 26:8 54:13
  71:23
**pain** 8:13,20 9:4
  44:5 48:6 49:21
  51:22,25 52:7,11
  57:5 60:3 73:3
  74:12 75:8
**painful** 74:1
**paper** 6:13
**paperwork** 72:15
**Parish** 20:19 21:1
**part** 3:20 8:15 39:9
  39:10 41:9
**parties** 3:10,15
  82:7,9
**party** 82:3,5
**pauses** 80:11
**pay** 36:6 54:13
  55:17 72:8
**paying** 27:1 54:19
  72:2
**people** 9:22 10:20
  77:21
**perfume** 29:8,9
**period** 24:14 52:21
  52:23 59:18 77:24
**person** 81:21
**personal** 81:14
**phlebotomy** 18:6
**phone** 13:24 14:12
  14:13 63:8 66:21
**phonetic** 45:14
**phonetically** 80:18
**photo** 74:11
**Photograph** 4:10
  4:11,12
**photos** 32:2 74:8
**phrase** 80:18
**phrases** 80:14
**physician** 55:25

**pick** 16:2 33:15
  38:3
**picked** 33:3,25 34:2
  38:9
**picking** 33:6 41:14
  73:23,24 77:19
**picture** 37:7 42:21
**pictures** 36:12,14
  36:22 74:6
**pink** 42:3
**place** 10:13 16:4,14
  17:13 50:8 64:9
**places** 15:24 64:12
  64:15,17 65:12,24
  66:1,13,14,16,19
**plaintiff** 2:3 3:3
**plan** 20:14 27:20
  67:8
**planning** 28:9
**plans** 28:2,3
**Plantation** 50:12
**playing** 38:25
**PN** 18:17
**pocket** 54:14
**point** 9:8 24:4 40:6
  44:7 48:14 53:21
  53:25 54:7,15
  55:14,16,20 73:10
**pointing** 8:21
**policy** 19:12
**position** 52:5
**possible** 6:4
**possibly** 76:12
**post** 15:9 17:25
**potential** 48:21
**pounds** 38:8,11
  78:2
**Poydras** 2:9
**practical** 18:17
**precaution** 71:11
**pregnancy** 18:15
  58:17,19 67:1
  69:16 71:22 72:3
  72:4 74:2
**pregnant** 7:2 59:3
  65:1,15,21 74:22
**prep** 32:25

**prepare** 7:23
**prepared** 81:14,17
**prepping** 72:25
**prescription** 34:18
**prescriptions** 75:1
**pretty** 16:2 24:11
  57:22 60:19 73:16
  74:5
**prevent** 25:17
  50:16 71:14
**prevented** 73:2,20
**preventing** 63:5
**primary** 55:24
**prior** 23:7 30:14
  39:10,16 53:21
  56:23 57:11 62:17
  70:2
**probably** 5:18
  16:10 30:7 33:17
  44:23 45:9 48:19
**problem** 7:6 63:25
**problems** 23:8
  53:11 58:10
**Procedure** 3:9 80:5
  80:6 81:24
**proceeding** 80:10
  80:13
**process** 20:4
**produce** 5:23
**product** 42:13
**program** 28:12
**prohibited** 82:1
**prohibition** 81:23
**promise** 15:1,4
**proper** 80:12
**provided** 36:14
**Ptolemy** 11:8
**pull** 12:8 54:9
**purchased** 45:25
**purchasing** 47:25
**purport** 36:15
**purposes** 3:8
**pursuant** 1:10 3:8
**put** 15:1 17:19
  30:24 58:6 61:1
  67:15 68:9,25
  69:21

**Q**

**question** 3:16 5:25
  6:5 7:5 31:8
  46:22 47:13 52:9
  73:12
**questions** 3:13 8:4
  8:6 43:21 70:11
  78:10 79:17
**quick** 7:4,12,21
  73:25
**quickly** 50:19

**R**

**R.S** 81:9
**ran** 76:11
**re-** 61:13
**read** 79:18
**reading** 3:12
**ready** 22:17
**real** 53:18
**realized** 59:3
**really** 6:2 9:11 22:2
  37:16 38:16 51:14
  58:4 73:24 76:10
  78:10
**reason** 6:25 17:20
  40:15,18 63:10
  69:19
**reasonable** 11:17
**reasons** 75:14
**recall** 34:11 49:6
  61:19
**receive** 18:18 72:15
**received** 74:14
**receiving** 74:18
**reception** 50:4,7
**recognize** 46:7
**recollection** 32:18
**recommended** 55:4
**record** 6:8,23 54:2
  54:9 75:16 78:15
  79:14,15 80:8
**records** 77:11
**recover** 72:17
**reduction** 3:13
**refer** 63:16
**reference** 38:16

80:17
**referred** 63:7
**regarding** 58:2
**related** 71:24 75:24
  75:25 82:6
**relationship** 59:12
  59:17,19 60:2
  82:2,5
**relationships** 81:23
**relying** 27:12
**remember** 17:3
  44:19 49:10
**remind** 6:18,19,19
**rent** 10:11,12 17:19
  17:19 27:6
**Renting** 10:21,22
**report** 39:6 44:18
  45:23 46:7
**reported** 81:12
**reporter** 1:12 3:7
  5:20 36:21 79:18
  80:3,23 81:5
  82:18
**Reporter's** 80:1,12
**reporting** 81:13
  82:3
**represent** 5:9 37:4
**representation**
  47:21
**request** 65:7
**requesting** 54:3
**required** 81:4,18
**reserve** 3:15,18
**Resources** 22:22
  23:1
**response** 32:15
**responses** 9:22
  18:22 29:2
**responsibilities**
  24:16
**responsible** 24:18
**responsiveness**
  3:17
**rest** 43:1
**restaurant** 15:23
**Restaurants** 22:12
  22:24 23:3

**restrictions** 77:11
**result** 9:5 17:14
  51:25 73:3
**Retail** 28:2
**retire** 22:18
**review** 7:22
**reviewed** 46:17
**Reviews** 20:8
**right** 3:18 5:8 6:10
  6:16 8:19,19 9:2,3
  9:6,22 10:7 11:3
  11:13 12:12,16
  14:18 17:1,21,23
  18:24 21:14 22:25
  24:15 25:1 28:20
  29:4,11 30:1 31:7
  31:15 32:4,8,10
  32:21 33:1,2,4,18
  34:7,9,21 35:7,8
  35:10,11,14,15,22
  38:11,20 39:3,7,9
  40:10,16,21,24
  42:5,10 45:21
  46:20 47:22 48:15
  48:20 49:1,15
  50:11 51:23 54:20
  54:24 58:10,16,17
  58:25 59:8,24
  60:16 61:2,6
  62:25 64:1 65:10
  65:20 66:7,25
  67:24 69:6 70:9
  70:11 72:6 73:8
  75:11,18
**rights** 3:21
**ring** 45:14
**role** 23:10
**rolled** 41:8
**Room** 49:24 50:2
**rough** 23:23
**rub** 60:9
**Rule** 80:5
**rules** 3:9 5:16 80:5
  81:19,25
**run** 24:12 73:1
**runaround** 63:9
**running** 24:14 27:9

38:25

────────── S ──────────

**S** 3:1
**Saturday** 49:12
**saved** 66:22
**savings** 27:5
**saying** 6:13 9:11
  43:9 72:16 77:12
**says** 10:2 29:1
  32:18 33:3,25
  34:7 39:6 54:2
  61:4
**scale** 58:3 69:1,8
**schedule** 64:20
**scheduled** 63:23
**school** 14:21,23
  15:8 18:1,5 27:15
  27:19,23 28:9
  32:19,20 33:7,18
  34:1 72:22
**seal** 81:4
**secondary** 15:9
  17:25
**section** 29:16,17,19
  29:21 30:6,13
**Security** 26:17
**see** 12:14 15:3
  17:18 40:19,20
  42:16 43:1 44:22
  45:13 46:14 55:9
  55:14,15,16 56:22
  61:13,21 62:3
  63:20 64:5 75:16
  76:11 77:10
**seen** 56:23 61:17
  69:11,13
**sent** 8:3 70:11 72:4
  79:3
**services** 81:22
**set** 67:10,12,13,18
  81:11
**seven** 10:25 14:17
  22:11,22 23:6
**shaking** 6:14
**shelf** 36:1 37:2
  39:10,16,19 42:10

71:12,14
**Shell** 2:9
**Shield** 72:5
**shift** 24:6,11,12
  40:6
**shoe** 35:8
**shop** 29:2,6,21
**shopped** 29:16
  30:18 39:25
**shopping** 35:17
  37:22 39:24
**short** 43:4
**shoulder** 8:21
  44:24
**shoulders** 9:12
**show** 6:13,15 9:9
  67:11,19 74:9
  78:17
**Shreveport** 12:1
  15:20,24 16:3,5,9
**shut** 19:16,18,22
**shutting** 19:13,14
  19:15
**sic** 22:23 68:11
**sign** 61:9 67:11,25
  79:18
**signature** 46:14
  81:3
**signed** 45:23,24
  46:9,13 47:17
**significant** 63:24
**signing** 3:12
**similar** 37:20
**sister** 31:10
**sister's** 31:11 32:25
  49:11,22
**sit** 43:16,22,25
  58:11
**sitting** 28:5 41:18
  71:12
**six** 28:19 48:24
  49:18 51:23 58:9
  68:23 69:10
**Sixteen** 25:7
**size** 36:2
**sleep** 52:5 74:1,2
**slip** 53:20

**slow** 76:4
**slower** 73:5,8
**SMITH** 2:8
**Social** 26:17
**soft** 6:20
**sold** 22:19
**somebody** 12:9
  22:7 63:16
**SONYA** 1:5,9 2:3
  3:5 5:1 81:8
**soon** 38:1
**sore** 49:19 69:7
**sorry** 20:17 23:2
  46:11 47:10 50:20
  52:8
**sound** 11:3 21:14
  39:7 49:1 54:24
  61:5 75:18
**sources** 26:21,24
  74:15
**speak** 6:2,21
**specifically** 50:24
  54:3 73:19
**spelled** 80:18
**spells** 51:3
**spine** 8:20 9:1
  76:13
**spoke** 59:23
**spoken** 6:20 14:8
**spontaneous** 80:9
**spot** 22:3 29:10
**Square** 2:9
**standing** 38:24
  39:3 41:19,20,22
  41:22,23 43:2
**start** 6:6 23:11,11
  23:14 71:21 72:21
  75:10
**started** 18:12 49:20
  53:4 54:22 66:4
  69:15
**state** 80:4,7 81:6
**states** 1:1 12:2
**statute** 81:18
**statutes** 3:8
**stay** 16:9,13,16
  17:7 27:3

**stayed** 16:17 57:20 57:22
**step** 20:9
**stepped** 23:20
**stipulated** 3:2
**stipulations** 1:11
**Stirgus** 1:5,9 2:3 3:5 5:1,6,8 17:10 31:12,14 78:10 81:8
**stitches** 56:5
**stolen** 24:21
**stop** 71:15
**store** 29:3,9 30:21 34:8 35:6 40:23 45:12
**stores** 1:7 2:7 22:1 34:8
**strange** 17:20 63:10
**Strategic** 22:12,17 22:22,24 23:3
**street** 2:9 10:6 11:8 11:8 21:5
**strength** 60:25
**strike** 41:6
**struck** 39:10,19 41:10 42:24
**studied** 17:24
**study** 15:11 18:16
**studying** 18:11
**stuff** 5:19 36:5 58:19 71:4 77:19 77:23 78:3
**subject** 70:25 71:6
**suggested** 76:21
**Suite** 1:13 2:5
**sum** 41:1
**Sunday** 51:2
**supervision** 81:15
**support** 54:4
**supposed** 19:19,21
**suppress** 51:22 52:6
**sure** 5:17 7:25 12:13,17 27:25 32:14 33:23 37:16

46:25 54:19 55:17 71:6
**sustained** 8:8,14 25:17
**swearing** 3:12
**switch** 62:15
**sworn** 5:2 80:7 81:9

───────────
**T**

**T** 3:1,1
**Taco** 15:23
**tag** 42:14
**tags** 36:2
**take** 7:4 12:10 14:25 48:21 51:22 58:16 67:19
**taken** 1:9 3:6,21 74:8 80:7 81:7
**takes** 24:9
**talk** 5:11 7:15 8:2 14:3,4 28:25 51:7
**talked** 5:17 14:1 46:17 60:11,14 63:11 78:15
**talking** 7:6 15:4 28:13 40:3 69:8
**talkovers** 80:11
**tall** 44:25
**TC** 37:2
**tell** 6:20 8:17 14:20 16:24 31:8 32:4 32:12,16 35:22 45:21 49:22 50:1 50:10 51:8,16,24 53:14 60:16,21 61:13 62:13,22 63:15,17 64:3,8 66:3 68:24 70:13 73:13,14 76:10,14 76:19 77:17
**telling** 8:7 9:4 64:14 70:18 77:9
**ten** 35:19 39:23,24 39:25 40:2,5 58:3 58:4 61:10
**term** 78:16

**terminated** 19:10 19:11 24:3 25:3 65:7
**termination** 20:1 23:7 24:20
**terms** 24:20 31:23
**testify** 5:3 10:3 81:10
**testimony** 3:21 80:7 81:7,12
**testing** 76:24
**tests** 76:11,14,21
**Texas** 12:4
**Thank** 47:10 69:17 79:19
**theft** 24:23
**therapy** 54:12,17 54:18,20 60:20 62:14 66:25 67:2 67:3,23 68:3
**thereabout** 57:18
**thereof** 3:12,20 82:10
**thing** 6:12,23 12:14 12:16 58:16 61:1
**things** 6:17 8:6 24:8 28:17 43:23 74:9,10 77:1
**think** 39:5 41:2 45:12 47:16 49:9 50:7,9 59:23 61:17 64:24 65:15 68:17,20 70:4,12 70:14,18,19,22 71:2,7,9 73:7 74:19 75:18 78:9
**third** 37:20 68:17
**thought** 5:7 48:7 54:15 68:22 78:18 79:3 80:11
**three** 16:3,10 29:3 29:23,24 30:8 36:22 44:16 57:19 58:6 62:4 64:7,16 64:17 65:12 66:1 66:13 67:5 78:1
**Thursday** 53:4,5,5

53:8,10 67:14
**ticket** 26:2,3
**tickets** 26:4,5
**till** 24:18
**time** 3:17,19 6:3 9:19,25 14:1 24:14 25:13 28:17 31:5,13 32:8 40:7 43:4 52:21,23 56:23 57:14 58:1 59:18 66:6 68:17 72:6 75:15,16 77:25 78:11
**times** 29:3,23,24,25 30:1,5,8 61:4,17 62:3,4,15,16 64:6 64:7,16,18 65:12 66:1,13 67:7
**tingling** 8:18 75:10 76:9 77:6
**today** 5:22 7:9,23 8:2 12:17 14:2,3 78:11
**told** 5:18 7:1 39:24 40:13 43:20 47:21 48:14 55:1,2,22 61:4 62:20 65:3 66:6 68:7 70:4 74:6 75:24 76:8 76:22 77:5 78:19
**TOMPKINS** 2:8
**top** 71:12
**touch** 13:21
**touched** 39:15,19
**traffic** 26:2,3,4,5
**transcribed** 81:14
**transcript** 9:9 15:2 80:15 81:3,17,18
**transcription** 80:13
**treat** 61:4,8
**treating** 54:22
**treatment** 7:18 55:11 56:2,15,17 56:19 62:6 71:24 72:8 76:1
**trial** 9:23
**true** 19:24 52:18

65:20,23 66:25 81:15
**try** 6:3 7:12,21
**trying** 18:16 50:7 63:4,15
**Tuesday** 49:20 51:18 52:22 67:16
**turn** 50:25 52:4 53:17,19 73:25
**turning** 73:25
**Twenty-Six** 25:4
**twice** 30:7 62:14
**twins** 27:8
**two** 9:23 10:14 12:22,23 14:17 17:8 18:13 30:8 33:12,18 42:9 43:21 44:16 48:8 54:23 56:13 60:24 61:4,22 62:8,16 67:7
**two/three** 46:4
**Tylenol** 51:21 58:16 74:19,20
**type** 71:11
**typewriting** 3:14

───────────
**U**

**U** 3:1
**uh-huh** 5:13 6:13 7:11 8:9 9:13 11:4 19:4,8 20:2 20:15 21:2 23:25 28:14 29:12 30:2 32:9 35:13 36:11 45:7 46:10 48:16 49:4 55:3,6 57:9 59:25 67:22 68:12 75:4
**undecided** 28:6
**undergo** 62:20,22 64:4 76:1
**undergone** 7:18 63:2 72:9
**underneath** 35:3 36:1 42:2,10
**understand** 7:9,25

9:16,24 24:7
31:15 32:10 48:23
**understanding**
76:16 81:16
**unh-unh** 6:14 16:8
50:23
**UNITED** 1:1
**unpaid** 26:5
**upper** 49:24 50:2
52:14 60:25
**Urgent** 48:25 49:8
54:5 57:4,7,10
69:18
**UTI** 57:6

**V**

**VA** 15:25 16:1
**vacation** 24:10
53:2,3,4
**valid** 81:2
**VAN** 1:7
**verified** 80:17
**VERSUS** 1:6
**video** 40:23,24 74:8
78:17,19,22,23,25
79:6
**view** 53:15
**vision** 8:12
**Voicewriting** 81:13

**W**

**W** 2:4
**wages** 9:17
**waive** 3:10
**walked** 34:7
**want** 7:25 12:8,14
43:17 54:10,13
59:22 60:22 73:2
73:18 74:2,3
75:14
**wanted** 5:7 43:16
52:2 54:18 67:23
**wasn't** 46:5
**way** 9:1 52:6 74:1
82:9
**we'll** 7:12 65:10
72:12
**we're** 5:10 6:3 7:5

7:15,15 8:2 24:24
28:12 38:1 40:3
46:22 59:17 69:8
71:2
**we've** 78:15
**wearing** 35:4
**wedding** 31:10,25
32:25 35:4 49:11
49:22 50:13,17,22
51:4 53:6 74:7
**wedge** 61:1 68:13
68:14,16
**Wednesday** 49:2,3
49:7,8,9,10,17
67:16
**week** 31:2 55:10,11
55:11,13 58:14
61:5 62:16 64:6,7
64:16,18 65:12
66:2,13 67:14,16
72:23
**weeks** 28:19 54:23
57:19 58:6 61:5
62:8,24 67:5
**weighed** 38:6
**weight** 38:17
**weird** 17:21
**went** 15:20 16:7
17:17 18:14 20:8
32:23 34:2,5
45:25,25 48:1,25
49:6,8 54:23 57:7
57:14,25 58:1
60:17 68:15,18
72:11
**weren't** 38:25
**West** 56:12
**Westbank** 49:25
50:2 58:20,22
**Westwego** 21:24
**whatnot** 56:5
**whatsoever** 56:15
56:17
**whoa** 76:4,4
**William** 2:4 32:20
**wires** 60:23
**witness** 3:13 37:17

47:3,7 65:2 79:20
**Woman's** 58:20,22
**word** 20:10
**words** 25:16 28:6
47:20 70:14 80:14
80:16
**work** 9:20 19:1
21:17,22 25:18
27:13,17,19,23,25
28:5 53:11 72:5
**worked** 25:14
**workers'** 26:15
**working** 15:21
25:12 26:19 52:24
77:15
**works** 15:25
**world** 58:5
**worry** 6:17 21:16
72:13
**worse** 57:20
**wouldn't** 40:15,24
48:19
**wow** 28:24
**write** 47:17,22
**writing** 15:3
**written** 8:4,6 75:1
**wrong** 19:17,18
24:24 70:13,15,17
71:8,10
**wrote** 8:5,10,10
44:17 45:23

**X**

**X** 74:11

**Y**

**Y** 74:11
**y'all** 16:7,13,16
27:6 31:23 59:7
60:1
**Yeah** 8:23,25 9:14
11:4 13:14 17:16
17:22 18:14,21
19:23 22:11,21
24:2 25:10 26:9
31:20 33:2 35:10
38:19 40:17 41:25
42:24,25 43:6,12

43:19 45:3,6 46:8
49:8 52:10 54:21
54:25 56:9 59:4
61:7 62:19 63:1
63:13 65:3 66:11
76:6 77:4,23 78:4
**year** 10:10 11:1
15:6,16 17:23
19:5 22:14 29:25
30:1,5,8,14 59:2
63:3 64:4,18,25
65:11 66:14 68:4
75:17 77:16
**years** 10:25 14:17
16:20 17:8 21:19
22:11 23:7,17
31:1 56:13 57:11
**yesterday** 59:24
64:1

**Z**

**Z** 74:11

**0**

**1**

**1** 4:9 10:17 36:21
**1:00** 19:22
**11th** 54:24 55:1
**12** 29:25,25 32:17
66:9,12
**13** 13:2
**13th** 19:5
**14.26** 25:4
**1418** 10:16
**1434** 80:6 81:25
**16** 25:6 56:24
**17** 32:15
**17-11645** 1:5
**19th** 1:14 81:10

**2**

**2** 4:10 36:22,23
37:7
**2:00** 19:21
**2:16** 1:15
**20** 57:18
**200** 1:13 2:5

**2000** 59:22
**2002** 15:7
**2006** 13:4
**2008** 59:22
**2009** 13:2
**2010** 11:2
**2010007** 80:23
82:18
**2011** 25:25 26:10
**2016** 5:12 32:17
57:3 60:18
**2017** 11:1,3,8 65:11
66:7 74:21
**2018** 1:14 19:2
81:10 82:11
**20th** 10:6
**21** 5:12 32:17 57:18
**21st** 49:15 51:24
52:23
**24th** 20:18
**25** 11:12
**25th** 82:11
**27th** 48:24 49:16
51:24 52:24
**28** 80:5

**3**

**3** 4:11 36:23,23
**3:30** 79:21
**30** 19:2 38:8,11
**30th** 19:6,7
**31** 13:4
**320** 1:12 2:5
**35** 30:1,5
**36** 4:9,10,11,12
**37:2554** 81:9
**3rd** 28:23 67:8

**4**

**4** 4:12 36:23,24
**40** 30:1,5
**403** 10:6
**4040** 2:9
**4230** 21:13

**5**

**5** 4:3

**6**

**7**

**70** 4:6
**701** 2:9
**70119** 1:14 2:5
**70139** 2:10

**8**

**8:05** 39:7
**80** 81:12
**84** 11:13











EXHIBIT

3

EXHIBIT

4

PENGAD 800-631-6989